UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PATRICK WALSH )
Plaintiff, )
)
)
-vs- )
)
DR. JOSEPH COLEMAN, CAROL )
CHAPDELAINE, COLLEEN GALLAGHER, )
GERALD HINES, sued in their )
individual capacities, and WILLIAM )
MULLIGAN, and ROLLIN COOK, sued in )
their official capacities, )
Defendants. )
)

SCANNED at ꞕꞕꞕ
and Emailed
6|24|19 by H . 94 pages
   date        initials      No.

PRISONER
CASE NO:_____ cv _____

COMPLAINT FOR MONEY DAMAGES AND INJUNCTION
JURY TRIAL DEMANDED

## I. INTRODUCTION

Patrick Walsh, an incarcerated pro se litigant and the Plaintiff herein,

brings forth this civil rights action against several officials from the

Connecticut Department of Corrections ("CTDOC"), for damages and injunctive

relief, pursuant to 42 U.S.C. § 1983. The Plaintiff avers the Defendants

were, and continue to be deliberately indifferent to the Plaintiff's serious

mental health needs; have failed to make reasonable accommodations for the

Plaintiff's disability; and applied standards that have had a disparate impact

on the Plaintiff, violating the Plaintiff's rights under the 8th Amendment

to the United States Constitution; the Americans with Disabilities Act ("ADA")

42 U.S.C. §§ 12101 et seq.; and the Rehabilitation Act ("RA") 29 U.S.C. §

794. A brief summary of the case hereby follows:

The Plaintiff has continually been in the custody of the CTDOC since

August of 1995. Prior to his arrest and subsequent incarceration, the

Plaintiff suffered from a long and significant mental health history. The

Plaintiff's mental health history is well-documented and was made available

to the CTDOC upon the Plaintiff's initial intake, including his psychiatric

-1-

evaluations and discharge summaries from various hospitalizations. The
Plaintiff was treated by the mental health staff, within the CTDOC for
approximately the first seven years of the Plaintiff's incarceration. Such
treatment was limited to psychiatric medications and random sessions with
a prison social worker.

The Plaintiff was then left untreated for a substantial amount of time
(approximately fourteen years), forced to self-regulate the symptoms of his
psychiatric condition and endure continual suffering of a deteriorating mental
state. The lack of mental health treatment culminated, causing a significant
disruption in the Plaintiff's everyday life. Fearing the inability to control
certain impulses and/or perceived threats (symptoms of the Plaintiff's
psychiatric conditions), the Plaintiff sought the help of CTDOC officials.
As fully articulated subsequently herein, the named Defendants' acts and
omissions have resulted in the unnecessary and wanton infliction of pain,
continual suffering causing irreparable harm and a failure to comply with
the recommended and prescribed course of treatment. The facts set forth below
demonstrate that the named Defendants were, and continue to be, deliberately
indifferent to the Plaintiff's serious medical needs and have violated the
legal rights afforded the Plaintiff as a disabled person.

II. JURISDICTION

(1) The Plaintiff invokes the jurisdiction of of this Honorable Court
pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under
the Constitution of the United States.

(2) The Plaintiff invokes the jurisdiction of this Honorable Court
pursuant to 28 U.S.C. § 1343(a)(3) in that this action seeks to redress the
deprivation, under color of state law, of rights secured by Acts of Congress
providing for equal rights of persons within the jurisdiction of the United

States.

(3) The Plaintiff invokes the jurisdiction of this Honorable Court pursuant to 42 U.S.C. § 12133 in that this action seeks to redress the deprivation, under color of state law, of rights secured under the ADA.

III. PARTIES

(4) The Plaintiff, Patrick Walsh, at all times relevant to the events described herein, was a prisoner incarcerated within the CTDOC. He is currently being housed at the MacDougall Correctional Institution, located at 1153 East Street South, Suffield, CT 06080 ("MCI").

(5) The Defendant, Dr. Joseph Coleman, at all times relevant to the events described herein, was the administrative psychologist in charge of overseeing Mental Health and Addiction Services at MCI. He is being sued in his individual capacity.

(6) The Defendant, Carol Chapdelaine, at all times relevant to the events described herein, was the warden at MCI. She is being sued in her individual capacity.

(7) The Defendant, Colleen Gallager, MA, CADAC, CCHP, at all times relevant to the events described herein, was in charge of the CTDOC's Health and Addiction Services. She is being sued in her individual capacity.

(8) The Defendant, Gerald Hines, at all times relevant to the events described herein, was the deputy warden and/or "acting" warden at MCI. He is being sued in his individual capacity.

(9) The Defendant, William Mulligan, at all times relevant to the events described herein, was the warden at MCI. He is being sued in his official capacity.

(10) The Defendant, Rollin Cook, is the current Commissioner of Correction for the CTDOC.[*] He is being sued in his official capacity.

_____
[*]At all times relevant to the events described herein, the Commissioner of Correction for the CTDOC was Scott Semple. In that Defendant Rollin Cook is being sued in his official capacity only, Rollin Cook is named as a defendant in place of his predecessor, Scott Semple.

(11) All defendants, named in ¶¶ 5 through 10 above, have acted and continue to act under color of law, at all times relevant to this complaint.

**IV. FACTS**

(12) The Plaintiff began attending individual, out-patient, therapy sessions in 1984, and continued to participate in such therapy sessions on a random basis, until August or September of 1986. The Plaintiff was initially diagnosed as suffering from Depression and Anxiety Disorder.

(13) In August, or September of 1986, the Plaintiff was hospitalized for approximately five weeks at Elmcrest Psychiatric Hospital, where the Plaintiff underwent treatment for acute intensified symptoms, deriving from his chronic psychiatric disabilities. The Plaintiff was further diagnosed as suffering from Dysthymic Disorder, Mixed Personality Disorder, and Episodic Alcohol Abuse.

(14) In August of 1989, the Plaintiff underwent further hospitalization at Bristol Hospital's Psychiatric Unit, where the Plaintiff received extensive treatment for exacerbated symptoms stemming from his dual diagnosed psychiatric disabilities. As part of his discharge plan, the Plaintiff was prescribed psychiatric medications.

(15) Subsequent to being released from the Bristol Hospital Psychiatric Unit, until October or November of 1991, the Plaintiff participated in an evening, out-patient, psychiatric treatment program, where his symptoms were continually monitored and treated as necessary.

(16) In October, or November of 1991, over the course of approximately six weeks, the Plaintiff received extensive therapy and treatment at Brattleboro Retreat, an in-patient psychiatric treatment center, for exacerbated symptoms of his psychiatric disabilities. The Plaintiff was diagnosed with post-traumatic stress disorder ("PTSD"), Major Depression,

-4-

and Anxiety Disorder. Additionally there was changes to the Plaintiff's psychiatric medications and the Plaintiff was to continue psychopharmacology.

(17) On November 14, 1994, the Plaintiff underwent a psychiatric evaluation, conducted by Doctor Walter Borden ("Dr. Borden"). Dr. Borden concluded that the Plaintiff was suffering from Chronic Depression, Chronic PTSD, Mixed Personality Disorder with depressive features.

(18) On March 17, 1995, the Plaintiff underwent an additional psychiatric evaluation, performed by Doctor Donald Grayson ("Dr. Grayson"), which further concluded that the Plaintiff suffers from Major Depressive Disorder, Chronic PTSD, Mixed Personality Disorder with borderline paranoid, antisocial, obsessive compulsive features.[1] The Plaintiff's prior history of the treatment received, for the acute symptoms of his ongoing psychiatric disabilities as described in ¶¶ 12 through 16 herein, were included in the evaluation performed by Dr. Grayson.

(19) On August 10, 1995, the Plaintiff was arrested, charged with Murder in violation of Connecticut General Statutes § 53a-54a, and was admitted into the custody of the CTDOC.

(20) Upon admission to CTDOC, the Plaintiff was seen by mental health staff.

(21) The evaluation reports prepared by Dr. Borden and Dr. Grayson, as described in ¶¶ 17 and 18 herein, respectively, were incorporated into the Plaintiff's CTDOC file. The discharge summaries from the Plaintiff's

_____

[1] The Plaintiff's diagnoses legally classify the Plaintiff as suffering from psychiatric disabilities. Pursuant to Connecticut General Statutes § 17a-458 (a), "[p]erson with psychiatric disabilities means those persons who are suffering from one or more mental disorders as defined in the most recent edition of the American Medical Association's Diagnostic Statistical Manual. The Plaintiff's legal classification as suffering from psychiatric disabilities further classifies the Plaintiff as a disabled person pursuant to the ADA and the RA.

-5-

hospitalizations, as described above in ¶¶ 13, 14 and 16 above, were also incorporated into the Plaintiff's CTDOC file.

(22) On June 22, 1999, the Plaintiff was found guilty of murder and on October 6, 1999, the Plaintiff was sentenced to a fifty-five year, day-for-day term of incarceration, to be served within the custody of the CTDOC.

(23) From his initial admission into the CTDOC until 2003, the Plaintiff was regularly seen by mental health staff contracted by the CTDOC. Throughout such time the Plaintiff was prescribed numerous trials of psychiatric medications, and was seen by several different therapists, from the various correctional institutions in which the Plaintiff was housed, within CTDOC.

(24) From 2003 until 2016, the Plaintiff was not monitored, nor treated by any mental health staff, for his chronic psychiatric disabilities, and also was not prescribed psychiatric medications throughout that time.

(25) Throughout the years the Plaintiff was left unmonitored and untreated the Plaintiff, utilizing Form CN 9601 Inmate Request Form ("Request"), on several occasions submitted requests to be seen by mental health staff. The Plaintiff was informed that in order to be seen, by mental health staff, regularly, the Plaintiff needed to take psychiatric medications. The Plaintiff was also informed, by mental health staff, that taking psychiatric medications would increase the Plaintiff's mental health classification to a "level three" "case management level", which would be the only way the Plaintiff could be seen by mental health staff on a regular basis.

(26) In 2013, the Plaintiff was transferred to MCI.

(27) In a two-page letter, dated August 29, 2016, to the Defendant, Carol Chapdelaine, the former warden at MCI ("Warden Chapdelaine"), the Plaintiff: (1) informed Warden Chapdelaine of his prior diagnoses and

-6--

hospitalizations for his chronic psychiatric disabilities; (2) explained that the procedures and policy changes at MCI had further exacerbated the symptoms of said psychiatric disabilities; and (3) outlined his reliance on the various methods available to him, and willingness to explore other means of therapy, in order to cope with the intensifying symptoms of his psychiatric disabilities. The Plaintiff also requested to be placed on "single cell status" ("SCS").

(28) In addition to the letter forwarded to Warden Chapdelaine, as described in ¶ 27 above, the Plaintiff filed a "Request for Reasonable Accommodations" pursuant to the ADA, utilizing CTDOC Form CN 101902 ("ADA Request"), dated August 29, 2016. The Plaintiff's ADA Request was to be placed on SCS and stated the reason for such accommodation was being "[c]ompelled to reside with numerous unknown cellmates over the past three years has caused a regression and deterioration of coping mechanisms in dealing with clinically diagnosed [psychiatric disabilities]". The Plaintiff also included the dates of his "Psychiatric Evaluations", confirming his diagnoses, as articulated in ¶¶ 17 and 18 above, and the dates and locations of his "Psychiatric Hospitalizations", as described in ¶¶ 13, 14, and 16 above, supporting the Plaintiff's legally classification as a disabled person.

(29) The Plaintiff submitted a Request to Defendant Doctor Joseph Coleman of the Mental Health and Addiction Services at MCI ("Dr. Coleman"), dated 9/1/16, stating that his "mental health condition is deteriorating due to conditions within the cell", and expressed concerns regarding his "ability to assess responses/actions of others in close quaters [sic], not as aggression." The Plaintiff asked Dr. Coleman to schedule an appointment to meet and assess/discuss the Plaintiff's needs.

(30) After not receiving any response to his letter dated August 29,

-7-

2016 to Warden Chapdelaine, as described in ¶ 27 above, the Plaintiff, still
suffering from exacerbated symptoms of his psychiatric disabilities, forwarded
a second letter, dated September 29, 2016, to Warden Chapdelaine seeking
approval of SCS and additionally explaining that the Plaintiff has "spoken
with Mental Health and have begun a treatment plan with them. Being aware
of my struggle with PTSD, they are in support of persuing [sic] a single
cell as part of the treatment plan."

(31) After his two letters to Warden Chapdelaine went unanswered, and
still experiencing intensified symptoms of his psychiatric disabilities,
the Plaintiff forwarded a four-page letter to Scott Semple, (former)
Commissioner of Corrections for the CTDOC ("Commissioner Semple"), dated
December 8, 2016, and requested assistance with the approval of SCS. In his
letter to Commissioner Semple, the Plaintiff outlined his suffering from
psychiatric disabilities and explained the reasons for the increasingly
intensified symptoms.

(32) In a letter to Dr. Coleman, dated January 15, 2017, approximately
four and a half months after the Plaintiff's initial Request, the Plaintiff
highlighted his repeated attempts to schedule an appointment to discuss and
address his concerns regarding the exacerbated symptoms of his psychiatric
disabilities. The Plaintiff also informed Dr. Coleman that the Plaintiff
was made aware of Dr. Coleman's refusal to evaluate and treat the Plaintiff.
The Plaintiff continued (and still continues) to suffer from mental anguish.

(33) After his initial ADA Request went unanswered, the Plaintiff
submitted a second "Request for Reasonable Accommodations", dated 1/15/17,
requesting the same reasonable accommodations (SCS), stating the same reasons
for such accommodations, as stated in the Plaintiff's initial ADA Request,
articulated in ¶ 28 above and incorporated hereto by reference. The Plaintiff

-8-

was suffering (and continues to suffer) from exacerbated symptoms of his psychiatric disabilities.

(34) The Plaintiff received a response to his second ADA Request, described in ¶ 33 above, which stated "Submitted to Dr. Coleman (Psychologist) for review", signed "Capt. Hall", and dated 1/27/17.

(35) The Plaintiff received an additional response to his second ADA Request,   described in ¶ 33 above, which stated "[Dr. Coleman] would support a tempary [sic] single cell status...final approve of single cell status contingent upon Warden approval" signed by both, "Joseph Coleman, Psy D" and "Capt Hall", respectively, and dated 1/31/17.

(36) In a letter to Dr. Coleman, dated January 31, 2017, the Plaintiff informed, Dr. Coleman that due to anxiety and further mental anguish, the Plaintiff was "uncomfortable" with the temporary nature of the SCS, as suggested, and asked to "see [Dr. Coleman] again at [his] earliest convenience."

(37) In a follow-up letter to Dr. Coleman, dated February 2, 2017, the Plaintiff further explained the additional anxiety and stress the temporary nature of the SCS would contribute to the Plaintiff's already exacerbated symptoms of his psychiatric disabilities and asked Dr. Coleman "to consider a more long term or permanent solution."

(38) The Plaintiff continued to (and still continues to) suffer and endure mental anguish. Nearly six months after the Plaintiff's initial correspondence to Warden Chapdelaine, the Plaintiff received a letter from Warden Chapdelaine, dated February 10, 2017, which stated that the Plaintiff's "letter addressed to Commissioner Semple dated December 8, 20176 [sic] has been forwarded to this office for response." Warden Chapdelaine further stated that the Plaintiff's "request for a single cell has been reviewed and [Warden

-9-

Chapdelaine] [] agreed to temporarily place [the Plaintiff] on that list. However, [] advised that this status is subject to review and changes due to bed space availability."[2]

(39) Realizing Warden Chapdelaine's approval of the Plaintiff's SCS was limited in (1) the status was temporary, subject to review, and contingent on bed space availability; and (2) facility specific (as a warden's authority is limited to the facility in which he/she governs), the Plaintiff forwarded a correspondence to Commissioner Semple, dated February 14, 2017, seeking permanent SCS, not to be limited to MCI. The Plaintiff, again, outlined his pain and suffering from symptoms related to his psychiatric disabilities and MCI's inadequate response and treatment of the same.

(40) The Plaintiff ultimately agreed to the temporary SCS and in a letter dated February 14, 2017, the Plaintiff thanked Warden Chapdelaine, and inquired into the process of making the necessary arrangements with the Unit Staff. Additionally, the Plaintiff advised Warden Chapdelaine that the Plaintiff already forwarded a letter Commissioner Semple, as described in ¶ 39 above, addressing the temporary nature of the SCS.

(41) The Plaintiff submitted an additional ADA Request, dated 3/3/17, requesting reasonable accommodations to receive "Facility transport to and from Court and/or medical trips". The Plaintiff stated the reason for such accommodations was "[d]ue to mental health conditions..." and outlined his psychiatric disabilities.

(42) The Plaintiff received a correspondence from Warden Chapdelaine, dated March 9, 2017, which also noted that the Plaintiff's "letter addressed to Commissioner Semple dated February 14, 2017 has been forwarded to this

---

[2] It is important to note that Warden Chapdelaine had not responded to any of the Plaintiff's prior letters/Requests, until the Plaintiff's "letter addressed to Commissioner Semple...[was] forwarded to [Warden Chapdelaine's] office for response."

office for response".[3] Warden Chapdelaine states that, "In 2016[4] I approved
your temporary placement on single cell status for approximately 3-4 months.
This approval is based on the recommendation from Dr. Coleman and that there
is no clinical reason to give you single cell status on a permanent status.
However you refused this offer and did not want to be placed on single cell
status. At this time my decision remains the same...."[5]

(43) In a letter dated March 23, 2017 to Warden Chapdelaine, the
Plaintiff again attempted to address the temporary nature of his SCS and
the Plaintiff advised Warden Chapdelaine of the ADA Request, as described
in ¶ 41 above, to be provided with "facility transport to court rather than
through Central Transportation Unit" ("CTU"). The Plaintiff again outlined
his psychiatric disabilities. The Plaintiff's correspondence went unanswered,
and the Plaintiff continued to suffer from mental anguish.

(44) In a Request, dated 4/3/17, the Plaintiff advised Warden Chapdelaine
that his "temporary" SCS commenced on March 24, 2017 and again "attempt[ed]
to resolve the temporary vs. permanent issue...." The Plaintiff's Request
went unanswered, and the Plaintiff continued to suffer from mental anguish.

---

[3] As previously noted, Warden Chapdelaine seems to only respond to the
Plaintiff's "letter[s] addressed to Commissioner Semple...[that get] forwarded
to [Warden Chapdelaine's] office for [a] response."

[4] Warden Chapdelaine mistakenly states "2016" as the year in which she approved
the Plaintiff's temporary SCS. As articulated in ¶¶ 35 and 38 herein,
Dr. Coleman initially supported the Plaintiff's "Request for Reasonable
Accommodations" regarding SCS on January 31, 2017 (as noted in the Plaintiff's
ADA Request). Thereafter, Warden Chapdelaine reviewed the Plaintiff's "request
for a single cell" and "agreed to temporarily place [the Plaintiff] on that
list", as stated in Warden Chapdelaine's letter dated February 10, 2017.

[5] Additionally, Warden Chapdelaine's correspondences stated "follow your Chain
of Command when inquiring on answers to your questions. You will receive
a timelier response". Warden Chapdelaine's statement fails to acknowledge
the several prior attempts, by the Plaintiff, to directly communicate and
try and resolve the issue with Warden Chapdelaine.

(45) In a letter to Dr. Coleman, dated April 26, 2017, the Plaintiff outlined the mental health treatment the Plaintiff had been undergoing, and the Plaintiff advised Dr. Coleman that the temporary SCS, Dr. Coleman prescribed commenced on March 24, 2017. The Plaintiff additionally inquired into the date of the initial review of the Plaintiff's SCS.

(46) In a Request, submitted to "Capt. Hall, ADA Coordinator", dated 4/28/17, the Plaintiff inquired into the status of his ADA Request concerning facility transport to court and/or medical trips, as described in ¶ 41 above.

(47) The Plaintiff's ADA Request, dated 3/3/17, as described in ¶ 41 above, was denied by "Capt. Hall" on 5/8/17, based on Dr. Coleman's assessment that "facility transport to medical appts + court is not supported by mental status findings..."

(48) Utilizing CTDOC Form CN 9602 "Inmate Administrative Remedy Form" the Plaintiff filed a "Grievance", dated 5/08/17, regarding the temporary designation of his SCS ("Grievance I").

(49) Utilizing CTDOC Form CN 9602 "Inmate Administrative Remedy Form" the Plaintiff filed a "Grievance", dated 5/12/17, regarding the denial of facility transport to court and medical trips ("Grievance II").

(50) The Plaintiff received a response to his Request, dated 4/28/17, described in ¶ 46 above and incorporated hereto by reference, signed "Capt Hall" and Dated 5/15/17. "Capt Hall" states that the Plaintiff's "ADA request was denied. Dr. Coleman evaluation (MH) states that facility transport is not necessary out [sic] this time."

(51) In a letter dated June 25, 2017, the Plaintiff informed Dr. Coleman that the Plaintiff was advised by Ms. Milna Rosario LCSW, of Mental Health and Addiction Services at MCI ("Ms. Rosario"), that Dr. Coleman requested Ms. Rosario notify the Plaintiff that the temporary SCS prescribed had

expired. Furthermore, the Plaintiff explained that "it ha[d] only been three months and [Dr. Coleman's] initial recommendation was for three to four months". The Plaintiff informed Dr. Coleman that the Plaintiff continued to suffer from exacerbated symptoms of his psychiatric condition, the Plaintiff outlined the treatment that the Plaintiff was undergoing and pleaded with Dr. Coleman to "consider the fourth month of the initial... recommend[ation]".

(52) The Plaintiff's letter to Dr. Coleman, dated June 25, 2017, described in ¶ 51 above, was returned to the Plaintiff with a hand-written reply, which stated, inter alia, that the the Plaintiff's "request for a single cell status is denied..." (undated) signed "Acting Warden G. Hines".[6] (Emphasis in original.)[7]

(53) Thereafter, the Plaintiff's SCS was revoked without any evaluations or assessment of the Plaintiff's psychiatric condition.

(54) In a letter dated June 26, 2017, to Defendant William Mulligan, the warden whom replaced Warden Chapdelaine at MCI ("Warden Mulligan"), the Plaintiff requested an extension of the temporary SCS previously prescribed, then revoked. The Plaintiff informed Warden Mulligan that the Plaintiff was "given single cell status. Albeit temporary...the act of providing the [single cell] status [by Mental Health Staff] established the fact that there is sometype of need for [the Plaintiff] to be in a single cell." Additionally, the Plaintiff forwarded a copy of the letter, described herein, to Commissioner Semple.

_____

[6]"Acting Warden G. Hines" is actually Defendant Gerald Hines, Deputy Warden at MCI.

[7]It is important to note that in revoking the Plaintiff's "temporary" SCS "Acting Warden G. Hines" does not mention the Plaintiff's mental health condition, any reassessment of evaluation thereof, nor the ADA.

(55) In response to the reply received by the Plaintiff, described in ¶ 52 above, the Plaintiff forwarded a correspondence to "Acting Warden Hines", dated June 29, 2017, in which the Plaintiff explained the basis of the request for SCS (i.e., ADA Request based on psychiatric disabilities).[8]

(56) The Plaintiff's letter addressed to "Acting Warden Hines", dated June 29, 2017 and described in ¶ 55 above, was returned to the Plaintiff with a hand-written reply which stated "If you are requesting a reasonable accommodation under the A.D.A. you must complete the attached form and turn it in to the A.D.A. coordinator for consideration", signed "W. Mulligan" and dated "7-6-17".

(57) Utilizing CTDOC Form CN 9602 "Inmate Administrative Remedy Form", the Plaintiff filed a "Grievance", dated July 7, 2017, regarding the revocation of his SCS ("Grievance III").

(58) On July 28, 2017, nearly one year after the Plaintiff informed both Administrative staff and Mental Health staff at MCI of his exacerbated symptoms from his psychiatric disabilities and deteriorating mental condition, the Plaintiff underwent an "Initial Psychiatric Evaluation". The Plaintiff's "Initial Psychiatric Evaluation" was conducted by Lea Pannella, APRN.

(59) Utilizing CTDOC Form CN 9602 "Inmate Administrative Remedy Form", the Plaintiff filed an "Appeal of a ADA Decision", dated July 29, 2017, regarding the revocation of his SCS.

(60) The Plaintiff was informed, via a letter dated August 24, 2017, that his ADA appeal, as described in ¶ 59 above, "has been logged on August 10th to [CTDOC Health and Addiction Services] office"; that the Plaintiff's

---

[8] The Plaintiff further explained that his "request for single cell status is not predicated on behavior...." Although thanking "Acting Warden Hines" for recognizing the Plaintiff's "no less than exemplary" behavior (quoting "Acting Warden Hines), the Plaintiff reasoned that "[i]f anything, exemplary behavior and the ability to self regulate thus far, should give credibility to the expression of [the Plaintiff's] needs...."

"appeal is pending decision but the investigation is lengthy given the history you have provided in the appeal; and for the Plaintiff to "continue to work with the local health team as needed to address health conditions and work with your treatment plan." The letter was signed by (Defendant) "Colleen Gallagher, MA, CADAC, CCHP" ("Mrs. Gallagher").

(61) On September 20, 2017, the Plaintiff entered into a "Psychoactive Medication Agreement", in which it was decided that the Plaintiff would be prescribed "clonidine", on a trial basis, for the exacerbated symptoms of his psychiatric disabilities.

(62) The Plaintiff received a correspondence, dated October 7, 2017, from Ms. Gallagher which stated:

> "Your ADA decision appeal has been investigated. Your appeal is
> currently modified. Per AD10.19 your appeal also takes into
> consideration whether your request for reasonable accommodations
> was reviewed by a qualified expert. Your accommodation was reviewed
> by a qualified psychologist but in keeping with the community
> standards an MD, in this case a psychiatrist, can be sought to
> review your case and provide expert opinion. Arrangements are
> being made to schedule this appointment on site, please anticipate
> an appointment with a Board Certified Psychiatrist.
>
> Please continue to work with the local health team as needed to
> address health conditions and work with your treatment plan and
> treatment providers. Scheduling a psychiatrist may take some time
> please be patient as an appointment will be made."

(63) The Plaintiff received a "Psychiatric Consultation" on October 19, 2017, by Sohrab Zahedi, MD ("Dr. Zahedi"), who opined that the Plaintiff "suffers from a severe anxiety condition. [Dr. Zahedi] also believe[s] that [the Plaintiff's] potential risk of outward or inward aggression...is substantial. From a clinical standpoint, [Dr. Zahedi] believe[s the Plaintiff] is need of somatic treatment, which includes medications"[9]. Dr. Zahedi also "believe[s] that [the Plaintiff] is correct that [the Plaintiff's] risk of

---

[9] Dr. Zahedi fails to take into account that the Plaintiff was taking a trial medication (Clonidine) for anxiety symptoms, at the time of the consultation.

aggression would be improved with a single cell status, [although] this environmental answer would do little to improve symptoms associated with his psychiatric condition."

(64) In a correspondence dated October 19, 2017, the Plaintiff replied to Ms. Gallagher's letter dated October 7, 2017, as described in ¶ 62 above, and the Plaintiff noted that the Plaintiff received Mrs. Gallagher's October 7, 2017 letter on October 19, 2017 "after the meeting with the psychiatrist, so [the Plaintiff] was unable to anticipate or be prepared for the meeting as [Mrs. Gallagher] had suggested." (Emphasis in original.) Furthermore, the Plaintiff explained, "that the meeting with Dr. Z[ahedi]...was very fustrating [sic] because [Dr. Zahedi] was completely focused on pharmachological therapy. [Dr. Zahedi] was unaware of [the Plaintiff's] history and showed little interest in hearing about the numerous medications [the Plaintiff] had already been prescribed over multiple years. And the nominal results of which always come at a disproportionate price such as interference with quality of life and [the Plaintiff's] spirituality".

(65) On November 1, 2017, the Plaintiff requested that the clonidine be discontinued.

(66) Mrs. Gallagher forwarded the Plaintiff a letter, dated December 18, 2017, regarding "the report written by Dr. Zahedi". Mrs. Gallagher stated that "[t]he report finds that [the Plaintiff] suffer[s] from a severe anxiety condition.... Since [the Plaintiff] [did] not have a treatment plan in place that addresses [the Plaintiff's] needs and concerns [Mrs. Gallagher] recommended [a treatment plan be] developed that addresses the need for alternative therapies [the Plaintiff] wish to try as well as trying medication options as suggested by Dr. Zahedi, and monitored by through psychopharmacology, that were not afforded [the Plaintiff] in the past. " Additionally,

-16-

Mrs. Gallagher "recommended [the Plaintiff] be afforded the opportunity to
be celled alone until such treatment plan is devised...." Although
Mrs. Gallagher stated such, the Plaintiff was not afforded the opportunity
and continued to suffer a deteriorating mental state.

(67) Based on Dr. Zahedi's evaluation, as described in ¶ 63 above, and
Mrs. Gallagher's recommendation, an initial Mental Health Interdisciplinary
Treatment Plan, ("Treatment Plan"), was developed and dated December 27,
2017. The Treatment Plan articulates the Plaintiff's diagnoses as "Anxiety
Disorder (severe)", "PTSD" and "ASPD" [Anti-Social Personality Disorder],
and lists "Obstacles to Treatment" as: "1. lack of single cell; 2. lack of
solitude; and 3. lack of a safe place". The Treatment Plan further lists
"Objective[s] (to address symptoms)" as "...a safe place where [the Plaintiff]
can work on reducing symptoms of anxiety and continue with somatic treatment..
.[the Plaintiff] is in consideration of taking psychotropic medication [and
is] willing to further discuss with a prescriber; interested in neurofeedback
and EMDR [Eye Movement Desensitization and Reprocessing] for self regulation;
[Plaintiff] will continue with own research on Developmental Trauma Disorder
and Complex PTSD; will continue to self-regulate with facility provided
programs, i.e. A[lternatives to] V[iolence] P[rogram], Hospice Volunteer,
Therapeutic Wellness Program facilitator, meditation, N/A and A/A, etc...."

(68) The December 27, 2017 Treatment Plan, as described in ¶ 67 above,
was presented to the Plaintiff by Ms. Rosario. The Plaintiff agreed with
what was articulated in the Treatment Plan and the Treatment Plan was signed
by both Ms. Rosario and the Plaintiff on December 27, 2017. Subsequently,
the Defendant Dr. Coleman, marked the Treatment Plan as "Draft" dated "1/3/18"
and initialed "J/C".

(69) Dr. Coleman devised an altered treatment plan in which Dr. Coleman,

without any further psychiatric evaluations or consultations with the
Plaintiff and contrary to Dr. Coleman's consultation notes, dated January
31, 2017, changed the "Diagnosis" from "Anxiety Disorder (severe)" to an
"Unspecified Anxiety Disorder" and omitted the "Diagnosis" of "PTSD",
essentially minimizing the severity of the Plaintiff's previously diagnosed
mental condition. Dr. Coleman changed the "Obstacles To Treatment" section
to state "[inmate] decision to not pursue the full array of treatment options
available", without any specification as to what treatment options Dr. Coleman
was referring to. Dr. Coleman further minimized and down-played the
Plaintiff's mental health issues by categorizing "Anxiety Disorder (severe)"
and "PTSD", as articulated in the December 27, 2017 Treatment Plan, as
"altered mood"  and "altered thought process" respectively. Additionally,
Dr. Coleman significantly minimized the "Manifested By (symptoms)" section
and changed the "Objective[s] (to address symptoms)" section of the Treatment
Plan.

(70) Dr. Coleman's alterations of the initial December 27, 2017 Treatment
Plan were presented to the Plaintiff by Ms. Rosario in the form of a new
Treatment Plan, dated January 9, 2018, which the Plaintiff did not sign.
The Plaintiff continued (and still continues) to suffer from a deteriorating
mental state.

(71) The frequency of the Plaintiff's therapy sessions with Ms. Rosario
increased from monthly sessions to weekly sessions in January of 2018.

(72) In February of 2018, the Plaintiff completed "scales" for Eye
Movement Desensitization and Reprocessing ("EMDR") therapy.

(73) The Plaintiff continued (and still continues) to suffer exacerbated
symptoms of his psychiatric disabilities, due to environmental stress of
a double-cell and anxiety over anticipated "Central Transportation" trips
to appointments outside of the facility.

-18-

(74) In September of 2018, approximately nine months after Dr. Zahedi's report and continued suffering by the Plaintiff, Mrs. Gallagher contacted Ms. Rosario, by way of "electronic mail", inquiring as to why there was not an active treatment plan signed by the Plaintiff. Ms. Rosario explained to Mrs. Gallagher that an initial Treatment Plan was developed and signed by the Plaintiff on December 27, 2017, based upon Dr. Zahedi's evaluation, as recommended by Mrs. Gallagher. However, Dr. Coleman subsequently marked the Treatment Plan as a "Draft" and devised a new treatment plan, wherein Dr. Coleman changed the Plaintiff's diagnoses, minimizing the Plaintiff's psychiatric disabilities, as well as several other significant alterations. The Plaintiff would not sign the altered Treatment Plan, due to the changes made by Dr. Coleman. (See, ¶¶ 67-70, above.) Mrs. Gallagher instructed Ms. Rosario to develop an agreeable treatment plan the Plaintiff is willing to sign.

(75) On September 22, 2018, per Mrs. Gallagher's instructions to Ms. Rosario to develop a new treatment plan (see, ¶ 74 above), Ms. Rosario devised a (newly formatted) "MH Treatment Plan". The September 22, 2018 Treatment Plan correctly lists the Plaintiff's "Diagnosis History: Chronic PTSD, MDD [Major Depressive Disorder], Severe Anxiety Condition"; "Goals"; and "Measurable Objectives"[10]. The Plaintiff agreed with what was stated in the MH Treatment Plan and both Ms. Rosario and the Plaintiff signed the MH Treatment Plan.

(76) On, or about, September 23, 2018, Ms. Rosario forwarded a copy of the signed and dated Treatment Plan developed on September 22, 2018 and

---

[10]It is important to note that all "Measurable Objectives" listed are the responsibility of the Plaintiff to utilize treatment options available, except § 1, Objective #3. § 1 "Reduction of Environmental Stress", Objective #3 states, "Custody will provide [the Plaintiff] with permanent SCS".

articulated in ¶ 75 above. Mrs. Gallagher did not express any issues or concerns with the September 22, 2018 Treatment Plan as devised.

(77) On, or about October 6, 2018, unbeknown to the Plaintiff, Dr. Coleman directed Ms. Rosario to append the September 22, 2018 Treatment Plan, to state "[Plaintiff] has not been promised, approved or authorized for permanent single cell status with the creation of this treatment plan".

(78) The Plaintiff attempted to verbally address the seriousness of his deteriorating mental health condition with Warden Mulligan, while Warden Mulligan was visiting the Plaintiff's housing unit on January 10, 2019. During the conversation, the Plaintiff referenced the several ADA Requests for Reasonable Accommodations, and responses therefrom and the need to be placed on SCS and receive facility transport to appointments outside of the facility (as mention throughout). Warden Mulligan requested the Plaintiff forward a correspondence outlining the details as discussed.

(79) The Plaintiff forwarded a letter, dated January 12, 2019, to Warden Mulligan, wherein the Plaintiff summarized the conversation, as described in ¶ 78 above, and the Plaintiff outlined his mental health condition and treatment issues, as Warden Mulligan requested. The Plaintiff did not receive a response.

(80) Due to increasingly intensified symptoms of his psychiatric disabilities, a diminished ability to self-regulate and anticipated change of cell partners, the Plaintiff began a prescription of psychotropic medication, in January of 2019.

(81) On February 18, 2019, the Plaintiff forwarded a Request to Warden Mulligan, "to inquire whether [Warden Mulligan] received the letter (as described in ¶ 79 above) and whether or not [the Plaintiff] should be awaiting a response from [Warden Mulligan]".

-20-

(82) The Plaintiff's Request to Warden Mulligan, as described in ¶ 81
above, was returned, dated February 26, 2019, with a response that stated:

> "I reviewed your request with MH staff & must point out some inaccurate
> or omitted information. First off, the temp cell alone status was
> granted in order for you to re-engage MH services, it was not permanent
> you also omitted an addendum to the treatment plan that indicated you
> were not approved or authorized permanent SCS as a result of the
> treatment plan."

The reply was signed by Warden Mulligan.[11]

(83) In February of 2019, the Plaintiff requested an increase in the
dosage of the psychotropic medication prescribed, due to significant increase
in anxiety, stemming from anticipated change of cell partners; diminishing
ability to self-regulate; and no changes in the Plaintiff's intensified
symptoms.

(84) The Plaintiff retained the services of an expert in the field of
clinical and forensic psychology, Assistant Professor of Psychiatry at the
University of Connecticut School of Medicine, Lecturer, Department of
Psychiatry at Yale University School of Medicine, Doctor Andrew Meisler,
Ph.D. ("Dr. Meisler"), early in the year 2018. Dr. Meisler is also an expert
in the area of PTSD. Based on Dr. Meisler's training and experience; a
thorough review of the Plaintiff's complete psychiatric history; and a series
of lengthy consultations with the Plaintiff (which the Plaintiff contends
is far beyond any research and/or analysis provided by any CTDOC Mental Health
staff), Dr. Meisler diagnosed the Plaintiff with Chronic PTSD; Chronic MDD;
Anxiety Disorder (severe), as previously diagnosed, and likely Bipolar
Disorder II, as well. Dr. Meisler states that being housed in a single cell

---

[11]Contrary to Warden Mulligan's reply, the Plaintiff's January 12, 2019 letter
did mention the "temporary" nature of the initial granting of SCS.
Additionally, the Plaintiff was unaware of any addendum to the MH Treatment
Plan, at that time. Most importantly, Warden Mulligan's response does not
address, or attempt to address the underlying issue (i.e., the Plaintiff's
deteriorating mental state, ADA Requests, Administrative Requests, etc.).

will mitigate the symptoms the Plaintiff continues to suffer from, and recommends SCS as part of the prescribed treatment for the Plaintiff's psychiatric disabilities.

(85) The Plaintiff has endured and continues to endure, unnecessary and prolonged suffering. The exacerbated symptoms of the Plaintiff's psychiatric disabilities have caused, and continue to cause, the Plaintiff mental anguish and an irreparable deteriorating mental state. Due to the environmental stress of a double-cell and anxiety over anticipated "Central Transportation" trips to appointments outside of the facility, the Plaintiff struggles in attempts to self-regulate, utilizing the methods as previously practiced with no relief. The Plaintiff continues to pursue all recommended and prescribed treatment options available, as outlined in the operative MH Treatment Plan, including (although **not** outlined in the MH Treatment Plan, nor required for ADA compliance) prescribed psychotropic medications, also with no relief.[12] "Custody" has not, nor will not, provide the Plaintiff with a single-cell eventhough: "temporary" SCS was previously provided based upon the recommendation of Dr. Coleman, and than revoked prematurely without any reassessment or evaluation; Dr. Zahedi stated SCS will improve the Plaintiff's symptoms; ADA Administrative Coordinator, Mrs. Gallagher, recommended the Plaintiff "be afforded the opportunity to be celled alone until [a] treatment plan is devised...." (Mrs. Gallagher never took the necessary steps to ensure the Plaintiff was afforded said opportunity and the Plaintiff never was afforded said opportunity); An official MH Treatment Plan was finally devised on September 22, 2018, which states, in part, "Custody will provide [the Plaintiff] with permanent SCS; and Dr. Meisler recommends SCS as part of the prescribed treatment of the Plaintiff's

---

[12]The prescribed psychotropic medication only provides a very limited relief for a singular aspect of the Plaintiff's intensified symptoms.

psychiatric disabilities and to prevent further deterioration of the Plaintiff's mental state. Furthermore, the Plaintiff already has canceled two scheduled appointment to the University of Connecticut Health Center, John Dempsey Hospital, located at 263 Farmington Avenue, in Farmington (one, on or around June 1, 2018 (Cardiology), and the other, on or around May 7, 2019 (Urology)), due to increased anxiety levels in anticipation of undergoing the procedures of the Centralized Transportation Unit ("CTU").[13]

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

(86) The Plaintiff hereby incorporates ¶¶ 12 through 85, of this "Complaint For Money Damages And Injunction", hereto by reference.

(87) The Plaintiff has exhausted all administrative remedies with respect to all claims, as they relate to all defendants.

## VI. LEGAL CLAIMS

### A. The Plaintiff Was, And Is, Being Subjected To Cruel And Unusual Punishment In Violation Of The Eighth Amendment To The United States Constitution.

(88) The Plaintiff hereby incorporates ¶¶ 12 through 85, of this "Complaint For Money Damages And Injunction", hereto by reference.

(89) The Defendant, Dr. Joseph Coleman's acts and omissions, as stated herein, constitute deliberate indifference to the Plaintiff's serious medical

---

[13] Without a resolution of the reoccurring transportation issue, the Plaintiff will be forced to choose between either enduring unnecessary and wanton infliction of pain and psychological torment, or go without having serious medical needs diagnosed and treated, both of which are antithetical to the law and Constitution. The Plaintiff highlights to this Honorable Court that it is the ordinary course of business for CTDOC to provide single-cells and direct transport to problematic inmates, or inmates with behavioral problems, when it is convenient to do so. Taking into account the Plaintiff's psychiatric disabilities, continual confinement in a double-cell environment as well as undergoing CTU transport to appointments outside the facility, is akin to mental torture with debilitating physiological effects. CTDOC officials should not be permitted to base conditions of confinement decisions on what is convenient, while denying disabled inmates reasonable accommodations that are identical.

needs. The Defendant, in failing to reassess/evaluate the Plaintiff's mental condition, prior to revoking the Plaintiff's "temporary" SCS designation; take the steps necessary to ensure the Plaintiff received mental health treatment, despite knowing the Plaintiff's serious medical need; willfully and maliciously altered the Plaintiff's treatment plans, to down-play the Plaintiff's diagnoses after the treatment plans were devised and agreed to; intentionally interfering in the Plaintiff's treatment, by ordering Ms. Rosario to append the MH Treatment Plan; and failing to assess, evaluate, and treat the Plaintiff, prior to denying the Plaintiff's ADA Request for direct transportation, disregarded an excessive risk to the Plaintiff's health and safety. The Defendant's actions were/are not adequate given the known risk. Additionally, the Defendant has caused (and continues to cause) unnecessary and wanton infliction of pain and suffering, upon the Plaintiff. The Plaintiff's pain and suffering has been/ is being unnecessarily prolonged, due to the Defendant's acts and omissions. Moreover, the acts of the Defendant and statements made, completely disregards the Plaintiff's serious medical needs and displays an indifferent attitude toward such medical needs.

(90) The Defendant, Carol Chapdelaine's acts and omissions, as stated herein, constitute deliberate indifference to the Plaintiff's serious medical needs. The Defendant, in failing to respond to the Plaintiff's serious medical needs, despite the Plaintiff apprising the Defendant of the  severity of such, and only responding to the Plaintiff after the Plaintiff's correspondence to the Commissioner of Correction was forwarded to the Defendant's office, caused unnecessary and wanton infliction of pain and suffering upon the Plaintiff, which was unnecessarily prolonged due to the Defendant's acts and omissions. The Defendant's acts and omissions disregarded an excessive risk to the Plaintiff's health and safety and were/are not

-24-

adequate given the known risk. Furthermore, the Defendant's failure to act demonstrates a complete disregard and indifferent attitude toward the Plaintiff's serious medical needs.

(91) The Defendant, Colleen Gallagher's acts and omissions, as stated herein, constitute deliberate indifference to the Plaintiff's serious medical needs. After pursuing an additional assessment/evaluation of the Plaintiff, by a "Board Certified Psychiatrist", and receiving the report, the Defendant (who is responsible for overseeing ADA compliance for the CTDOC), made a recommendation as to the course of treatment, but failed to ensure such treatment was carried out; failed to inquire into the need for the Plaintiff to receive direct transportation, and caused unnecessary and wanton infliction of pain and suffering upon the Plaintiff. The Defendant's acts and omissions unnecessarily prolonged the Plaintiff's pain and suffering, disregarded an excessive risk to the Plaintiff's health and safety, and were not adequate given the known risk.

(92) The Defendant, Gerald Hines' acts and omissions, as stated herein, constitute deliberate indifference to the Plaintiff's serious medical needs. The Defendant, in denying the Plaintiff's request for an extension of the "temporary" SCS, to include at the very minimum the fourth month of the initial three-to-four month recommendation, without any reassessment or evaluation of the Plaintiff's mental condition, disregarded an excessive risk to the Plaintiff's health and safety. Furthermore, the complete denial of SCS in the same regard, also fails to take into account the excessive risk to the Plaintiff's health and safety. The Defendant's actions were/are not adequate given the known risk. Additionally, the Defendant has caused, and continues to cause, unnecessary and wanton infliction of pain and suffering upon the Plaintiff. The Plaintiff's pain and suffering has been/

-25-

is being unnecessarily prolonged, due to the Defendant's acts and omissions.
Moreover, statements made by the Defendant demonstrate only a concern for
the Plaintiff's behavior and/or problems caused to staff, completely
disregards the Plaintiff's serious medical needs and display an indifferent
attitude toward such medical needs.

### B. The Plaintiff Is Being Unlawfully Subjected To Discrimination, Excluded From Participation In, and Denied The Benefits Of, Services, Programs, and Activities, In Violation Of The Americans With Disabilities Act and The Rehabilitation Act.

(93) The Plaintiff hereby incorporates ¶¶ 12 through 85, of this
"Complaint For Money Damages And Injunction", hereto by reference.

(94) The Plaintiff suffers from psychiatric disabilities that
substantially limits his major life activities and is a "qualified person
with a disability" as defined by the ADA and "otherwise qualified" in
accordance with the RA.

(95) The Plaintiff is being denied access to, and excluded from receiving
the benefits of medical services, by the Defendants' denial of SCS and direct
transportation to medical appointments outside of the facility.[14]

(96) The Defendants have failed to make reasonable accommodations for
the Plaintiff's disabilities, in denying the Plaintiff SCS and direct
transportation to medical appointments outside of the facility.

(97) The Defendants' acts and omissions have a disparate impact on the
Plaintiff, in that the Defendants provide single-cells and direct
transportation to appointments outside the facility to problematic inmates,
or inmates with behavioral problems when it is convenient to do so, while
denying disabled inmates reasonable accommodations that are identical.

(98) The Defendants' acts and omissions violate the Plaintiff's rights
under the ADA and RA.

---

[14]Although the Plaintiff is not wholly precluded from participating in this
service, he is subject to pain and suffering, in the form of psychological

**VII. REQUEST FOR RELIEF**

Wherefore, the Plaintiff respectfully requests that this Honorable Court grant the following relief:

A. Issue a declaratory judgment stating that:
   1. The Defendants violated the Plaintiff's rights under the Eighth Amendment to the United States Constitution;
   2. The Defendants violated the Plaintiff's rights under the Americans with Disabilities Act and the Rehabilitation Act.

B. Issue a permanent injunction ordering Defendants William Milligan and Rollin Cook, their successors in office, agents, employees and all other persons acting in concern to:
   1. Designate the Plaintiff as having permanent single-cell status;
   2. Provide the Plaintiff with direct transportation to appointments outside of the correctional facility in which the Plaintiff is housed.

C. Award compensatory damages in the following amounts:
   1. $150,000 (one hundred fifty thousand) against Defendant Joseph Coleman;
   2. $10,000 (ten thousand) against Defendant Carol Chapdelaine;
   3. $50,000 (fifty thousand) against Defendant Colleen Gallagher;
   4. $50,000 (fifty thousand) against Defendant Gerald Hines.

D. Award punitive damages in the amount of: $1,500,000 (one million five hundred thousand).

E. Any other such relief the Plaintiff may be entitled, under law and in the interest of justice.

Respectfully Submitted,

*Patrick Walsh*   5/21/19

Patrick Walsh
Plaintiff, Pro se

---

(continued)...torment, each time he attempts to take advantage of outside medical appointments. Surely, the Plaintiff is being denied the benefits of this service.