# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

PATRICK WALSH,
    *Plaintiff*,

v.

JOSEPH COLEMAN *et al.*,
    *Defendants*.

No. 3:19-cv-00980 (JAM)

## INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A

Patrick Walsh is a prisoner in the custody of the Connecticut Department of Correction ("DOC") and is currently confined at MacDougall Walker Correctional Institution. He has filed a complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983 against six correctional officials in their individual and official capacities for damages and injunctive relief. Walsh claims that defendants violated his Eighth Amendment right against prison officials' deliberate indifference to his serious medical needs, and that defendants violated his rights under the Americans with Disabilities Act (ADA) and the Rehabilitation Act. His claims principally arise from the denial of his multiple requests to be placed on single cell status as well as his request for special transport arrangements for any trips he must make outside of the prison facility. Walsh requests damages, a declaratory judgment, and a permanent injunction. In the interim, he seeks a temporary restraining order or—in the alternative—a preliminary injunction. For the reasons stated below, I will dismiss the Eighth Amendment claim, allow the ADA and Rehabilitation Act claims to proceed, and deny without prejudice Walsh's request for a temporary restraining order and preliminary injunction.

## BACKGROUND

Walsh has named the following six defendants: DOC Commissioner Rollin Cook, MacDougall-Walker Wardens Carol Chapdelaine and William Mulligan, Deputy Warden Gerald Hines, Dr. Joseph Coleman, and DOC Health and Addiction Services head Colleen Gallagher.The following facts are alleged in the complaint and are accepted as true only for purposes of this ruling. Prior to his incarceration, Walsh underwent psychiatric evaluation and treatment. Doc. #1 at 4 (¶¶ 12-16). He was previously diagnosed with Post-Traumatic Stress Disorder ("PTSD"), chronic depression, anxiety, mixed personality disorder, episodic alcohol abuse, paranoia, and obsessive compulsive disorder. *Id.* at 4-5 (¶¶ 12-18). Walsh had been hospitalized and treated with various psychiatric medications. *Ibid.* (¶¶ 14-16).

On August 10, 1995, Walsh was arrested and admitted into DOC custody. Doc. #1 at 5 (¶ 19). Upon his admission, he was evaluated by mental health personnel, who incorporated his written medical history. *Id.* at 5-6 (¶¶ 20-21). On June 22, 1999, Walsh was found guilty of murder and later sentenced to a term of 55 years of imprisonment. *Id.* at 6 (¶ 22).

During the first four years of his sentence, Walsh was regularly seen by DOC mental health staff and was prescribed numerous trials of psychiatric medications. *Ibid.* (¶ 23). From 2003-2016, however, Walsh was not evaluated or treated by mental health staff for his chronic conditions, nor was he prescribed any medications. *Ibid.* (¶ 24). During those years, Walsh filed numerous requests but was told that he could only see mental health staff if he was taking medications. *Ibid.* (¶ 25). Walsh also learned that being prescribed medications would increase his inmate mental health classification to a Level 3, which would require evaluations on a regular basis. *Ibid.*

In 2013, Walsh was transferred to MacDougall-Walker. *Ibid.* (¶ 26). On August 29, 2016, he wrote a two-page letter to Chapdelaine, who was then the warden of MacDougall-Walker, informing her of his documented mental health diagnoses and treatment and that his confinement at MacDougall-Walker had worsened his symptoms. *Id.* at 6-7 (¶ 27). Walsh also requested that he be placed on single-cell status at MacDougall-Walker. *Id.* at 7 (¶ 27). That same day, he also filed a Request for Reasonable Accommodations ("RRA") requesting single-cell status. *Ibid.* (¶ 28). Walsh reasoned that his confinement "with numerous unknown cellmates over the past three years ha[d] caused a regression and deterioration of coping mechanisms in dealing with clinically diagnosed [psychiatric disabilities]." *Ibid.* Walsh documented his previous evaluations, diagnoses, and hospitalizations in support of his RRA. *Ibid.*

On September 1, 2016, Walsh submitted a request to Dr. Coleman, stating that his "mental health condition [was] deteriorating due to conditions within [his] cell" and describing his difficulty with relating to others in his unit. *Ibid.* (¶ 29). He asked Dr. Coleman to schedule an appointment for an evaluation. *Ibid.*

On September 29, 2016, Walsh sent a second letter to Chapdelaine, who had not responded to his first letter, again seeking approval for single-cell status. *Id.* at 7-8 (¶ 30). Walsh explained that he had spoken with mental health personnel, who commenced a treatment plan for him, and that they supported single-cell status for him. *Id.* at 8 (¶ 30). Once again, Chapdelaine did not respond to the letter. *Ibid.* (¶ 31).

On December 8, 2016, Walsh sent a four-page letter to former Commissioner of Correction Scott Semple, requesting approval for single-cell status. *Ibid.* (¶ 31). Walsh outlined his psychiatric conditions and explained that his symptoms were worsening. *Ibid.*

3

One month later, on January 15, 2017, Walsh wrote a letter to Dr. Coleman, highlighting his repeated attempts to schedule a mental health evaluation and explaining that Coleman was refusing to evaluate him. *Ibid.* (¶ 32). That same day, Walsh submitted a second RRA, explaining the reasons for SCS and that he continued to suffer exacerbated symptoms of his psychiatric conditions. *Id.* at 8-9 (¶ 33). He received a response to his second RRA later that month, stating that Dr. Coleman "would support a temporary [single-cell status] [but that] final approv[al] of [single-cell status] [was] contingent upon Warden approval." *Id.* at 9 (¶¶ 34-35). The response was signed by both Dr. Coleman and Captain Hall. *Ibid.* (¶ 35).

Walsh responded with a letter to Dr. Coleman on January 31, 2017, informing him that, because of his anxiety and "mental anguish," he was uncomfortable with a "temporary" single-cell status assignment, and he needed Coleman to evaluate him. *Ibid.* (¶ 36). Walsh sent a follow-up letter on February 2, 2017, elaborating on his increased anxiety and stressing that the temporary single-cell status would only contribute to his already worsen[ing] symptoms. *Ibid.* (¶ 37). He asked Coleman "to consider a more long-term or permanent solution." *Ibid.*

On February 10, 2017, Walsh received a letter from Chapdelaine regarding the letter he had sent to Semple. *Ibid.* (¶ 38). The letter stated that Walsh's "request for a single cell ha[d] been reviewed and [Chapdelaine] [had] agreed to temporarily place [him] on that list. However, [the] status is subject to review and changes due to bed space availability." *Id.* at 9-10 (¶ 38).

After learning that his single-cell status was limited depending on further review and availability and specific only to MacDougall-Walker, Walsh forwarded a letter to Semple requesting permanent single-cell status, which would apply to all DOC facilities. *Id.* at 10 (¶ 39). He again outlined his worsening psychiatric symptoms and the inadequate treatment he was receiving at MWCI. *Id.* Walsh ultimately agreed to the temporary single-cell status and thanked

Chapdelaine in a follow-up letter dated February 14, 2017. *Ibid.* (¶ 40). He advised Chapdelaine that he had already sent another letter to Semple requesting permanent single-cell status. *Ibid.* On March 9, 2017, he received another response from Chapdelaine stating that she had approved him for temporary single-cell status for three to four months based on Dr. Coleman's recommendation but that there were no clinical reasons for permanent single-cell status. *Id.* at 10-11 (¶ 42).

On March 3, 2017, Walsh submitted his third RRA, requesting that he receive "[f]acility transport to and from [c]ourt and/or medical trips" because of his mental health conditions. *Id.* at 10 (¶ 41). In a letter to Chapdelaine dated March 23, 2017, Walsh again attempted to address the temporary nature of his single-cell status and advised her of his third RRA for facility transports to court as opposed to transporting him via Central Transport Units ("CTUs"). *Id.* at 11 (¶ 43).[1] Chapdelaine did not respond to this letter, and Walsh continued to endure mental health problems. *Ibid.*

On April 3, 2017, Walsh advised Chapdelaine that his temporary single-cell status had commenced on March 24, 2017, but that he still wished to receive permanent single-cell status. *Ibid.* (¶ 44). He also sent a letter to Dr. Coleman on April 26, 2017, advising him about his temporary single-cell status and inquiring when it would be reviewed. *Id.* at 12 (¶ 45).

On April 28, 2017, Walsh sent a request to Captain Hall inquiring about his RRA for facility transports. *Ibid.* (¶ 46). That RRA was later denied based on Dr. Coleman's conclusion that "facility transport to medical [appointments] [and] court is not supported by mental status

---

[1] The complaint does little to describe the difference between a "facility transport" and a "Central Transport Unit transport." As the Court understands it, a facility transport affords the possibility of a direct and private ride in a facility-specific vehicle from the facility to a court or to a medical appointment, while a Central Transport Unit ride is more likely in common with other inmates and may involve intermediate stops or transfers at other facilities. *See generally DeAngelis v. Farinella,* 2017 WL 4683996, at *6 (D. Conn. 2017).

5

findings." *Ibid.* (¶ 47). Walsh later filed two written grievances, dated May 8, and May 12, 2017, complaining about his inability to receive permanent single-cell status and facility transports. *Ibid.* (¶¶ 48-49). Walsh received a response from Hall explaining that Dr. Coleman had determined that facility transports were not necessary at that time. *Ibid.* (¶ 50).

In a letter dated June 25, 2017, Walsh informed Dr. Coleman that he had been advised by mental health personnel that his temporary single-cell status had expired. *Id.* at 12-13 (¶ 51). Walsh explained that it had only been three months since his temporary single-cell status began, and Coleman's recommendation was for "three to four months." *Id.* at 13 (¶ 51). Walsh also informed Coleman that he continued to suffer from exacerbated psychiatric symptoms and pleaded with him to "consider the fourth month of the initial . . . recommend[ation]." *Ibid.*

This letter was later returned to Walsh with a hand-written response signed by Deputy Warden Hines, stating that his request for single-cell status was denied. *Ibid.* (¶ 52). Thereafter, Walsh's single-cell status was revoked without any evaluation of his mental health condition. *Ibid.* (¶ 53). Walsh wrote a letter to Warden Mulligan on June 26, 2017, requesting an extension of his single-cell status. *Ibid.* (¶ 54). He informed Mulligan that, although his single-cell status had been temporary, it established that there was "some type of need for [him] to be in a single cell." *Ibid.* Walsh forwarded a copy of the letter to Commissioner Semple. *Ibid.* In response to Hines's previous letter, Walsh replied by letter to Hines explaining the basis for his single-cell status, that it was "not predicated on behavior." *Id.* at 14 (¶ 55) & n.8. Warden Mulligan later informed him that, if he was making a RRA, it must go through the ADA coordinator. *Ibid.* (¶ 56).

Walsh then filed a grievance and an ADA appeal in July 2017 contesting the revocation of his single-cell status. *Ibid.* at 14 (¶¶ 57, 59). On July 28, 2017, Walsh underwent an "Initial

6

Psychiatric Evaluation" by Nurse Lea Pannella. *Ibid.* (¶ 58). Three months later, he entered a "Psychoactive Medication Agreement," which provided for a trial prescription of Clonidine for his psychiatric symptoms. *Id.* at 15 (¶ 61). Walsh requested discontinuation of the Clonidine a month later, on November 1, 2017. *Id.* at 16 (¶ 65).

On August 24, 2017, Walsh received a letter from Gallagher regarding his ADA appeal. *Id.* at 14-15 (¶ 60). Gallagher stated that his appeal "ha[d] been logged . . . that [it was] pending decision, but the investigation is lengthy given the history [that he had] provided." *Ibid.* She instructed Walsh to "continue to work with the local health team as needed to address health conditions and work with [his] treatment plan." *Ibid.*

On October 7, 2017, Walsh received further correspondence from Gallagher regarding his ADA appeal. *Id.* at 15 (¶ 62). Gallagher informed him that his ADA appeal was investigated and reviewed by a qualified psychiatrist and that a medical appointment would be scheduled. *Ibid.* Gallagher instructed Walsh to continue to work with his treatment plan and providers because scheduling an appointment with a psychiatrist may take some time. *Ibid.*

Walsh underwent a "Psychiatric Consultation" on October 19, 2017 with Dr. Sohrab Zahedi. *Ibid.* (¶ 63). Dr. Zahedi opined that Walsh "suffers from a severe anxiety condition" and that he was at a "substantial" risk of "outward or inward aggression." *Ibid.* Dr. Zahedi determined that Walsh was need of somatic treatment, including medications. *Ibid.* He agreed with Walsh that his risk of aggression would be improved through single-cell status, though it "would do little to improve symptoms associated with his psychiatric condition." *Id.* at 15-16 (¶ 63). Afterward, Walsh sent a letter to Gallagher explaining that his meeting with Dr. Zehedi "was very frustrating because [Dr. Zahedi] was completely focused on pharmacological therapy,

7

. . . was unaware of [Walsh's medical] history, and showed little interest in hearing about the numerous medications [Walsh] had been prescribed over multiple years." *Id.* at 16 (¶ 64).

On December 18, 2017, Gallagher sent Walsh a letter in response to his report about Dr. Zehedi. *Ibid.* (¶ 66). Gallagher recommended that a treatment plan be developed for Walsh "that addresses the need for alternative therapies" and medication options as suggested by Dr. Zehedi. *Id.* at 16-17 (¶ 66). Moreover, Gallagher recommended that Walsh be placed on single-cell status until his treatment plan was devised. *Ibid.* But Walsh was not placed on single-cell status, and his conditions continued to worsen. *Ibid.*

Based on Zehedi's and Gallagher's recommendations, an initial "Mental Health Interdisciplinary Treatment Plan" was developed for Walsh on December 27, 2017. *Id.* at 17 (¶ 67). The plan articulated Walsh's diagnoses as severe anxiety disorder, PTSD, and Anti-Social Personality Disorder and listed the lack of solitude and a single cell as "Obstacles to Treatment." It recommended "a safe place where [Walsh] can work on reducing symptoms of anxiety and continue with somatic treatment." *Ibid.* The plan stated that Walsh was willing to take psychotropic medication and would continue to self-regulate with facility-provided programs. *Ibid.*

Walsh agreed with the statements in the treatment plan, which he signed, and Dr. Coleman initialed. *Ibid.* (¶ 68). Coleman later devised an altered treatment plan on December 31, 2017, without any further psychiatric evaluations or consultations with Walsh. *Id.* at 17-18 (¶ 69). Coleman changed the written diagnosis of severe anxiety disorder to an "unspecified anxiety disorder" and omitted PTSD as a diagnosis. *Ibid.* He also wrote in the "Obstacles to Treatment" section that it was Walsh's "decision . . . not [to] pursue the full array of treatment options available." *Ibid.* Coleman wrote that Walsh suffered from an "altered mood" and "altered

8

thought process" and changed the "Objectives" section of the plan. *Ibid.* Coleman's altered version of the treatment plan was presented to Walsh on January 9, 2018, which Walsh refused to sign. *Ibid.* (¶ 70).

In January 2018, Walsh began monthly therapy sessions with Milna Rosario, a licensed social worker. *Ibid.* (¶ 71). He also completed "scales" for Eye Movement Desensitization and Reprocessing ("EMDR") therapy. *Ibid.* (¶ 72). However, he continues to suffer worsening symptoms because of the "environmental stress of a double cell and anxiety over anticipated [CTU] trips to appointments outside the facility." *Ibid.* (¶ 73).

In early 2018, Walsh retained Dr. Andrew Meisler, an assistant professor of psychiatry at Yale and an expert in clinical and forensic psychology, to evaluate him. *Id.* at 21 (¶ 84). Based on his review Walsh's psychiatric history and consultations with Walsh, Meisler diagnosed Walsh with chronic PTSD, chronic "MDD," severe anxiety disorder, and bipolar disorder. *Ibid.* He opined that being housed in a single cell would mitigate Walsh's symptoms and, therefore, recommended that Walsh be placed on SCS. *Ibid.*

In September 2018, Gallagher e-mailed Rosario inquiring why there had not been an active treatment plan signed by Walsh. *Id.* at 19 (¶ 74). Rosario explained that, although Walsh signed the initial plan based on Gallagher's and Zehedi's recommendations, he refused to sign the altered plan devised by Coleman. *Ibid.* Gallagher instructed Rosario to develop an agreeable plan that Walsh was willing to sign. *Ibid.*

On September 22, 2018, per Gallagher's instructions, Rosario drafted a new treatment plan. *Ibid.* (¶ 75). The treatment plan correctly listed Walsh's diagnoses, goals and objectives. *Ibid.* The plan also stated that "Custody will provide [Walsh] with permanent single-cell status; and Dr. Meisler recommends single-cell status as part of the prescribed treatment of [Walsh's]

9

psychiatric disabilities and to prevent further deterioration of [Walsh's] mental state." *Id.* at 22-23 (¶ 85). Walsh agreed with this plan and signed off on it. *Id.* at 19 (¶ 75). The next day, Rosario forwarded a copy of the signed plan to Gallagher, who did not express any issues or concerns. *Id.* at 19-20 (¶ 76). On October 6, 2018, unbeknownst to Walsh, Gallagher directed Rosario to amend the plan to state that Walsh "has not been promised, approved or authorized for permanent [single-cell status] with the creation of this treatment plan." *Id.* at 20 (¶ 77).

On January 10, 2019, Walsh attempted to verbally address his deteriorating mental health condition to Warden Mulligan, who was visiting his housing unit. *Ibid.* 20 (¶ 78). Walsh stated that he had filed RRAs and other requests to be placed on single-cell status and receive facility transports. *Ibid.* Mulligan requested that Walsh forward him a correspondence outlining his issues. *Ibid.* Walsh then forwarded a letter to Mulligan two days later addressing his concerns, but he did not receive an immediate response. *Ibid.* (¶ 79). Walsh sent a follow-up later on February 18, 2019, to which Mulligan responded with the following:

> I reviewed your request with [mental health] staff [and] must point out some inaccurate or omitted information. First off, the temp[orary] [single-cell status ] was granted in order for you to re-engage [mental health] services. [I]t was not permanent. [Y]ou also omitted an addendum to the treatment plan that indicated you were not approved or authorized permanent SCS as a result of the treatment plan.

*Id.* at 20-21 (¶¶ 81-82).

Due to his worsening psychiatric symptoms, Walsh began taking psychotropic medication in January 2019. *Id.* at 20 (¶ 80). One month later, he requested an increase in the dosage of his medication due to increased anxiety over a change in cellmates, diminishing ability to self-regulate, and no change in his other psychiatric symptoms. *Id.* at 21 (¶ 83).

Walsh continues to endure exacerbated symptoms associated with his psychiatric problems. *Id.* at 22-23 (¶ 85). Due to the environmental stress of being in a double cell and the

anxiety he experiences over anticipated CTU trips, he struggles with self-regulation and cannot get relief. *Ibid.* Walsh continues to pursue all recommended and prescribed treatment options available under the operative treatment plan, including psychotropic medications. *Ibid.* The DOC will not grant Walsh permanent single-cell status despite previously being granted temporary single-cell status and Zehedi's and Gallagher's recommendations. *Ibid.* Moreover, Walsh cancelled two scheduled medical appointments at the UConn Health Center on June 1, 2018, and May 7, 2019, due to increased anxiety over traveling in a CTU. *Ibid.*

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

11

Walsh claims that the actions of Coleman, Chapdelaine, Gallagher, and Hines all amounted to a violation of his Eighth Amendment right against deliberate indifference to serious medical needs, and he has sued those defendants in their individual capacities. Doc. #1 at 3, 23-25 (¶¶ 5-8, 88-92). Walsh has also sued Cook and Mulligan in their official capacities on the ground that defendants violated his rights under the ADA and Rehabilitation Act by denying him permanent single-cell status and solo transports. *Id.* at 3, 26 (¶¶ 9-10, 93-98).

### *Eighth Amendment deliberate indifference*

The Supreme Court has held that a prison official's deliberate indifference to the serious medical needs of a prisoner amounts to a violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Second Circuit has in turn made clear that a prisoner who claims deliberate indifference to a serious medical need must satisfy two requirements. First, there is an *objective* requirement—that the prisoner's medical need was sufficiently serious. *See Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). The prisoner must show that he suffered from an urgent medical condition involving a risk of death, degeneration, or extreme pain. *See Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011). Second, there is a *subjective* requirement: that the defendant has acted recklessly—that is, with an actual awareness of a substantial risk that serious harm to the prisoner would result from the defendant's action or non-action. *See Spavone*, 719 F.3d at 138. It is not enough to allege simple negligence or negligent medical malpractice. *See Hilton v. Wright*, 673 F.3d 120, 127 (2d Cir. 2012) (*per curiam*); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). Instead, a prisoner must show that the defendant acted with the equivalent of a criminally reckless state of mind when denying treatment for the prisoner's medical needs. *See Collazo v. Pagano*, 656 F.3d 131, 135 (2d Cir. 2011) (*per curiam*).

To the extent that Walsh's claim is understood as an Eighth Amendment challenge to his conditions of confinement, the Eighth Amendment does not guarantee a prisoner the right upon request to be housed in a single cell. *See, e.g.*, *Jarecke v. Hensley*, 552 F. Supp. 2d 261, 265-66 (D. Conn. 2008). I understand Walsh's claim instead to be that the denial of single-cell status and requested transport arrangements amounts to deliberate indifference to his serious mental health needs.

I will assume that Walsh has alleged facts to show that he suffers from severe anxiety, PTSD, and various personality disorders. A combination of severe mental conditions like these are sufficient to satisfy the objective prong of the Eighth Amendment standard for deliberate indifference. *See Currytto v. Furey*, 2019 WL 1921856, at *5 (D. Conn. 2019) (collecting cases). Nevertheless, the facts do not plausibly establish that any of the defendants recklessly disregarded a substantial risk that Walsh would suffer serious harm as a result of their conduct denying Walsh's requests.

Walsh has instead alleged facts showing that since 2016, he has and continues to receive medical care for his mental conditions, including prescription medications, therapy sessions, and self-regulating activities. *See* Doc. #1 at 22 (¶ 85) ([Walsh] "continues to pursue all recommended and prescribed treatment options available, as outlined in [his] operative [mental health] treatment plan"). Although their responses were not always prompt, the defendants reviewed and analyzed Walsh's requests for permanent single-cell status and facility transports. And indeed, although Walsh alleges that Dr. Meisler recommended single-cell status for him, *see* Doc. #1 at 21-22 (¶ 84), he also alleges that Dr. Zahedi found that single-cell status status "would do little to improve symptoms associated with his psychiatric condition," *id.* at 16 (¶ 63). In light of Dr. Coleman's overall attentiveness to Walsh's conditions and the real difference in medical

opinion about the best course of treatment, Walsh has not alleged facts to show that Dr. Coleman's actions were the product not merely of a difference of opinion about treatment or simple neglect but of reckless indifference to Walsh's medical needs. *See Hill*, 657 F.3d at 123 (affirming dismissal of complaint where facts equally consistent with reasonable difference of medical opinion or medical negligence as deliberate indifference); *cf. Johnson v. Wright*, 412 F.3d 398, 400 (2d Cir. 2005) (genuine issue of fact as to deliberate indifference where "defendants reflexively applied [prison] policy in the face of *unanimous, express, and repeated*—but contrary—recommendations of plaintiff's treating physicians" (emphasis added)).

By the same token, Walsh has not alleged facts to plausibly show that the remaining individual capacity defendants acted out of recklessness towards Walsh's conditions as opposed to negligently or innocently on the basis of divided medical opinion. Because Walsh has alleged facts that show no more than grounds for difference of medical opinion rather than reckless indifference, he has not alleged plausible grounds for an Eighth Amendment claim of deliberate indifference to his serious medical needs.

### *ADA and Rehabilitation Act*

In order to prevail on a claim under either Title II of the ADA or § 504 of the Rehabilitation Act, a plaintiff "must show that 1) he is a qualified individual with a disability; 2) [the defendant] is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from [the defendant's] services, programs, or activities [or that the defendant] otherwise discriminated against him by reason of his disability." *Wright v. N.Y. State Dept' of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). Because the ADA and Rehabilitation Act permit suits only against individual defendants in their official rather than individual capacities, *see Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (official-capacity claim for injunctive relief may proceed

under the ADA and Rehabilitation Act); *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) ("[N]either Title II of the ADA nor §504 of the Rehabilitation Act provides for individual capacity suits against state officials."), I understand Walsh to mean to assert ADA and Rehabilitation Act claims only against the two defendants he has sued in their official capacities: Mulligan and Cook. *See* Doc. #1 at 3 (¶¶ 9-10). Any ADA and Rehabilitation Act claim against individual capacity defendants Coleman, Chapdelaine, Gallagher, and Hines is therefore dismissed. Similarly, because Walsh's prayer for relief requests compensatory damages from all and only the individual capacity defendants, *see* Doc. #1 at 27 (¶ C), while requesting injunctive relief against all and only the official capacity defendants, *see ibid.* (¶ B), I understand Walsh to request exclusively injunctive relief on his ADA and Rehabilitation Act claims. Although Walsh does not allege that he has been subject to discrimination *because* of animus against his disability, *see Tuttle v. Semple*, 2018 WL 2088010, at *7 (D. Conn. 2018), it appears that Walsh may nonetheless have plausibly alleged a failure-to-accommodate claim under the ADA and Rehabilitation Act claim against Cook and Mulligan. At least for initial pleading purposes, Walsh's allegations that he suffers from numerous mental conditions are sufficient to state a claim that Walsh is a qualified individual with a disability. Walsh otherwise alleges that he was denied a reasonable accommodation with respect to his requests for single-cell status and facility transport. This conclusion is for initial review purposes only and without prejudice to the right of any defendant to file a motion to dismiss if there are further grounds to conclude that Walsh has not alleged a plausible claim for relief.

### *Temporary restraining order and preliminary injunction*

In addition to his complaint, Walsh has also filed a motion for a temporary restraining order against defendants, or in the alternative a preliminary injunction. *See* Doc. #7. A temporary

restraining order is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Reidy*, 477 F. Supp. 2d 472, 474 (D. Conn. 2007) (quoting *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005)). Under Federal Rule of Civil Procedure 65(b)(1), the court may issue an *ex parte* temporary restraining order only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." The legal standard governing the grant of a temporary restraining order is otherwise the same as the standard that governs the grant of a preliminary injunction. *See Vann v. Fisher*, 2011 WL 6788404, at *1 (S.D.N.Y. 2011). Accordingly, a party seeking a temporary restraining order or preliminary injunctive relief "must generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest." *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).

As to the remaining ADA and Rehabilitation Act claims, Walsh has not demonstrated a likelihood of success. His allegations establish at most a reasonable ground for a medical difference of opinion about whether he needs a further accommodation as to his cell status and any prison transport arrangements. *See Abrams v. Waters*, 2018 WL 1469057, at *6 (D. Conn. 2018) (denying preliminary injunctive relief claim for single-cell status). Accordingly, there is no basis for a grant at this time of a temporary restraining order or preliminary injunctive relief.

## CONCLUSION

In accordance with the foregoing analysis, the Court enters the following orders:

(1) Walsh's ADA and Rehabilitation Act claim for injunctive relief may proceed against Cook and Mulligan in their official capacities only. All other claims and defendants to this action are DISMISSED.

(2) The Clerk shall prepare a summons form and send an official capacity service packet, including the complaint (Doc. #1), to the United States Marshal Service. The U.S. Marshal is directed to effect service of the complaint on defendants Cook and Mulligan in their official capacities at the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141, by **August 8, 2019**, and to file a return of service by **August 17, 2019**.

(3) All defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

(4) The Clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

(5) Discovery, pursuant to Federal Rules of Civil Procedure 26-37, shall be completed by **January 14, 2020**. Discovery requests need not be filed with the Court.

(6) All motions for summary judgment shall be filed by **February 13, 2020**.

(7) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(8) If Walsh changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court. Failure to do so can result in the

dismissal of the case. Walsh must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Walsh has more than one pending case, he should indicate all of the case numbers in the notification of change of address. Walsh should also notify defendants or defense counsel of his new address.

It is so ordered.

Dated at New Haven this 18th day of July 2019.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge