# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

PATRICK WALSH,
    *Plaintiff*,

v.

DR. JOSEPH COLEMAN, *et al.*,
    *Defendants*.

No. 3:19-cv-980 (JAM)

## INITIAL REVIEW ORDER RE AMENDED COMPLAINT

Plaintiff Patrick Walsh is a sentenced prisoner of the Connecticut Department of Correction ("DOC"). He has filed an amended complaint against the DOC and numerous state prison officials arising from their alleged failure to accommodate his requests for single-cell status and for special facility transport arrangements when it is necessary for him to leave his prison facility for medical or legal reasons. Walsh alleges that defendants have violated his right to be free from cruel and unusual punishment under the Eighth Amendment and his rights to be free from disability discrimination and to a reasonable accommodation for his disabilities under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794 *et seq*.

In accordance with my duty under 28 U.S.C. § 1915A to conduct an initial review of Walsh's complaint, I conclude that Walsh has not alleged plausible Eighth Amendment claims against any of the defendants. I further conclude that he has not alleged plausible claims under the ADA and the Rehabilitation Act against any of the individual defendants but that he has alleged a plausible claim under the ADA and the Rehabilitation Act against defendants Cook and

Barone in their official capacities. Accordingly, I will allow Walsh's amended complaint to proceed solely against Cook and Barone in their official capacities.

**BACKGROUND**

Walsh's claims arise from his confinement at the MacDougall-Walker Correctional Institution ("MWCI"). He filed an initial complaint on June 24, 2019, alleging claims under the Eighth Amendment, the ADA, and the Rehabilitation Act against the following defendants: DOC Commissioner Rollin Cook; MWCI Wardens Carol Chapdelaine and William Mulligan; Deputy Warden Gerald Hines; Dr. Joseph Coleman; and DOC Health and Addiction Services Head Colleen Gallagher. Doc. #1.

On July 18, 2019, I issued an initial review order dismissing the Eighth Amendment claims and allowing the ADA and Rehabilitation Act claims to proceed against two of the defendants—Cook and Mulligan—in their official capacities only for injunctive relief. Doc. #8; *Walsh v. Coleman*, 2019 WL 3231194 (D. Conn. 2019).

Walsh has now filed an amended complaint as of right pursuant to Fed. R. Civ. P. 15 that names the same defendants but that also includes two more defendants: the DOC and Kristine Barone (the current warden of MWCI), who is sued in her official capacity only. The following facts are alleged in the amended complaint and are accepted as true only for purposes of this ruling.

Prior to his incarceration, Walsh underwent psychiatric evaluation and treatment. Doc. #9 at 4-5 (¶¶ 14-16). He was previously diagnosed with Post-Traumatic Stress Disorder ("PTSD"), depression, anxiety, mixed personality disorder, episodic alcohol abuse, and dysthymic disorder. *Id.* at 4 (¶ 15). Walsh had been hospitalized and treated with various psychiatric medications. *Id.* at 4-5 (¶ 16).

On August 10, 1995, Walsh was arrested and admitted into DOC custody. *Id.* at 6 (¶ 21). Upon his admission, he was evaluated by mental health personnel, who incorporated his written medical history into his medical history file. *Ibid.* (¶¶ 22-23). On June 22, 1999, Walsh was found guilty of murder and was later sentenced to a 55-year term of imprisonment. *Ibid.* (¶ 24).

During the first four years of his sentence, Walsh was regularly seen by DOC mental health staff and was prescribed numerous trials of psychiatric medications. *Ibid.* (¶ 25). From 2003 to 2016, however, Walsh was not evaluated or treated by mental health staff for his chronic conditions, nor was he prescribed any medications. *Ibid.* (¶ 26). During those years, Walsh filed numerous Inmate Request Forms asking to be seen by mental health staff, but was told that he could only regularly see staff if his inmate mental health classification was a Level 3. *Id.* at 6-7 (¶ 27). But because Walsh was not taking psychiatric medications, he did not qualify for a Level 3. *Ibid.*

In 2013, Walsh was transferred to MWCI. *Id.* at 7 (¶ 28). On August 29, 2016, he wrote a two-page letter to Carol Chapdelaine, who was then the warden of MWCI, informing her of his documented mental health diagnoses and treatment, and explaining that his confinement at MWCI had worsened his symptoms. *Ibid.* (¶ 29). Walsh also requested that he be placed on single-cell status at MWCI. *Ibid.* That same day, he also filed a Request for Reasonable Accommodations ("RRA") requesting single-cell status. *Ibid.* (¶ 30). In the RRA, Walsh reasoned that his confinement "with numerous unknown cellmates over the past three years ha[d] caused a regression and deterioration of coping mechanisms in dealing with clinically diagnosed [psychiatric disabilities]." *Ibid.* Walsh documented his previous evaluations, diagnoses, and hospitalizations in support of his RRA. *Ibid.*

On September 1, 2016, Walsh submitted an Inmate Request to Dr. Joseph Coleman, asking to schedule an appointment for an evaluation and stating that his "mental health condition [was] deteriorating due to conditions within [his] cell" and describing his difficulty to relate to others in his unit. *Id.* at 7-8 (¶ 31). Dr. Coleman failed to respond. *Ibid.* (¶ 31).

On September 29, 2016, Walsh sent a second letter to Warden Chapdelaine, who had not responded to his first letter, again seeking approval for single-cell status. *Id.* at 8 (¶ 32). Walsh explained that he had spoken with mental health personnel, who commenced a treatment plan for him and who supported single-cell status for him. *Ibid.* Once again, Chapedelaine did not respond to the letter. *Ibid.* (¶ 33).

On December 8, 2016, Walsh sent a four-page letter to then-Commissioner of Correction Scott Semple, requesting approval for single-cell status. *Ibid.* Walsh outlined his psychiatric conditions and explained that his symptoms were worsening. *Ibid.*

One month later, on January 15, 2017, Walsh wrote another letter to Dr. Coleman, highlighting his repeated attempts to schedule a mental health evaluation and explaining that he was made aware of Dr. Coleman's refusal to evaluate him. *Ibid.* (¶ 34). Walsh also submitted a second RRA, explaining the reasons for single-cell status and that he continued to suffer exacerbated symptoms of his psychiatric conditions. *Id.* at 8-9 (¶ 35). He received two responses to his second RRA later that month, one of which stated that Dr. Coleman "would support a temporary single-cell status [but that] final approval of single-cell status [was] contingent upon Warden approval." *Id.* at 9 (¶¶ 36-37). The response was signed by Dr. Coleman and a "Capt. Hall." *Id.* at 9 (¶ 37).

Walsh responded with a letter to Dr. Coleman on January 31, 2017, informing him that, because of his anxiety and "mental anguish," he was uncomfortable with a "temporary" single-

4

cell assignment, and he needed Dr. Coleman to evaluate him. *Ibid.* (¶ 38). Walsh sent a follow-up letter on February 2, 2017, elaborating on his increased anxiety and stressing that the temporary single-cell status would only contribute to his already worsening symptoms. *Ibid.* (¶ 39). He asked Dr. Coleman "to consider a more long-term or permanent solution." *Ibid.*

On February 10, 2017, Walsh received a letter from Warden Chapdelaine regarding the letter he had sent to Semple. *Id.* at 9-10 (¶ 40). The letter stated that Walsh's "request for a single cell ha[d] been reviewed and [Chapdelaine] [had] agreed to temporarily place [him] on that list. However, [the] status is subject to review and changes due to bed space availability." *Ibid.*

After learning from Chapdelaine that the proposed temporary single-cell status was dependant on further review and availability, as well as specific only to MWCI, Walsh forwarded a letter to Commissioner Semple requesting permanent single-cell status applicable to all DOC facilities. *Id.* at 10 (¶ 41). He again outlined his worsening psychiatric symptoms and the inadequate treatment he was receiving at MWCI. *Ibid.* Walsh ultimately accepted the temporary single-cell status and thanked Chapdelaine in a follow-up letter dated February 14, 2017. *Ibid.* (¶ 42). He advised Chapdelaine that he had already sent another letter to Semple requesting permanent single-cell status. *Ibid.* On March 9, 2017, he received another response from Chapdelaine stating that she had approved him for temporary single-cell status for one to four months based on Dr. Coleman's recommendation but that there were no clinical reasons for permanent single-cell status. *Id.* at 10-11 (¶ 44). Neither Chapdelaine nor Dr. Coleman responded to Walsh's letters and requests until after the Commissioner's office forwarded the letters to them for a response. *Id.* at 11 (¶ 45).

On March 3, 2017, Walsh submitted his third RRA, requesting that he receive "[f]acility transport to and from [c]ourt and/or medical trips" because of his mental health conditions. *Id.* at

5

10 (¶ 43). "Facility transport" provides a prisoner with a "direct and private ride" from the facility to a court or medical appointment, in contrast to "Central Transportation Unit" transport, which involves group transportation of numerous inmates. *Ibid*. n.2. In a letter to Chapdelaine dated March 23, 2017, Walsh again attempted to address the temporary nature of his single-cell status, and also advised her of his third RRA for facility transports to court as opposed to transporting him via Central Transport Units ("CTUs"). *Id.* at 12 (¶ 46). Chapdelaine did not respond to this letter, and Walsh continued to endure mental health problems. *Ibid.*

On April 3, 2017, Walsh advised Chapdelaine via Inmate Request that his temporary single-cell status had commenced on March 24, 2017 but that he still wished to receive permanent single-cell status. *Ibid.* (¶ 47). He also sent a letter to Dr. Coleman on April 26, 2017, advising him about his temporary single-cell status and inquiring when it would be reviewed, but he received no response. *Id.* at 12-13 (¶ 48).

On April 28, 2017, Walsh sent an Inmate Request to Captain Hall inquiring about his previously submitted RRA for facility transports. *Id.* at 13 (¶ 49). That RRA was later denied based on Dr. Coleman's conclusion that "facility transport to medical [appointments] [and] court is not supported by mental status findings." *Ibid.* (¶ 50). Walsh later received a response from Hall to his April 28 Inmate Request, which explained that Dr. Coleman had determined that facility transports were not necessary at that time. *Ibid.* (¶ 53). Walsh later filed two written grievances, dated May 8, 2017 and May 12, 2017, complaining about his inability to receive permanent single-cell status and facility transports. *Ibid.* (¶¶ 51-52).

In a letter dated June 25, 2017, Walsh informed Dr. Coleman that he had been advised by mental health personnel that his temporary single-cell status had expired. *Ibid.* (¶ 54). Walsh explained that it had only been three months since his temporary single-cell status began, and Dr.

Coleman's recommendation was for "three to four months." *Ibid.* Walsh also informed Dr. Coleman that he continued to suffer from exacerbated psychiatric symptoms and pleaded with him to "consider the fourth month of the initial . . . recommend[ation]." *Ibid.*

This letter was later returned to Walsh with a hand-written response signed by Deputy Warden Hines, stating that his request for single-cell status was denied. *Id.* at 13-14 (¶ 55). Thereafter, Walsh's single-cell status was revoked without any evaluation of his mental health condition. *Id.* at 14 (¶ 56). Walsh wrote a letter to Warden Mulligan on June 26, 2017, requesting an extension of his single-cell status. *Ibid.* (¶ 57). He informed Mulligan that, although his single-cell status had been temporary, it established that there was "some type of need for [him] to be in a single cell." *Ibid.* Walsh forwarded a copy of the letter to Commissioner Semple. *Ibid.* Mulligan later informed him that, if he was making a request for a reasonable accommodation, it must go through the ADA coordinator. *Id.* at 14-15 (¶ 59).

On June 29, 2017, Walsh replied to Deputy Warden Hines explaining the basis for his single-cell status. *Id.* at 14 (¶ 58). He thanked Hines for recognizing his "no less than exemplary" behavior but insisted that his request for single-cell status was "not predicated on [his] behavior." *Ibid.* Walsh then filed a grievance and an ADA appeal in July 2017 contesting the revocation of his single-cell status. *Id.* at 15 (¶ 60, 62).

On July 28, 2017, Walsh underwent an "Initial Psychiatric Evaluation" by Nurse Lea Pannella. *Ibid.* (¶ 61). Three months later, he entered a "Psychoactive Medication Agreement," under which he agreed to prescribed medication for his psychiatric symptoms on a trial basis. *Id.* at 16 (¶ 65).

On August 24, 2017, Walsh received a letter from Colleen Gallagher regarding his ADA appeal. *Id.* at 15 (¶ 63). Gallagher stated that his appeal "ha[d] been logged . . . that [it was]

7

pending decision, but the investigation is lengthy given the history [that he had] provided." *Ibid.* She instructed Walsh to "continue to work with the local health team as needed to address health conditions and work with [his] treatment plan." *Ibid.* In mid-September 2017, Gallagher met with Walsh and explained to him that, due to Dr. Coleman's review, she would submit a request for a "comprehensive review" of his request for a reasonable accommodation with Dr. Burns, a qualified psychiatrist, "in keeping with community standards." *Id.* at 15-16 (¶ 64).

On October 7, 2017, Walsh received further correspondence from Gallagher regarding his ADA appeal. *Id.* at 16 (¶ 66). Gallagher informed him that his ADA appeal was reviewed by a qualified psychologist, and that an appointment with a psychiatrist would be scheduled to review his case and provide an expert opinion. *Ibid.* Gallagher instructed Walsh to continue to work with his treatment plan and providers because scheduling an appointment with a psychiatrist might take some time. *Ibid.*

Walsh underwent a "Psychiatric Consultation" on October 19, 2017, with Dr. Sohrab Zahedi. *Id.* at 16-17 (¶ 67). Dr. Zahedi admitted that, prior to their consultation, he only had time to review "one of [Walsh's] four mental health charts" and that he had limited experience with PTSD and other trauma disorders. *Ibid.* Dr. Zahedi opined that Walsh "suffers from a severe anxiety condition" and that he posed a "substantial" risk of "outward or inward aggression." *Ibid.* Dr. Zahedi determined that Walsh was in need of somatic treatment, including medications. *Ibid.* He agreed with Walsh that his risk of aggression would be improved through single-cell status, although he opined that single-cell status "would do little to improve symptoms associated with his psychiatric condition." *Ibid.* Dr. Zahedi did not mention in his report that Walsh was taking trial medication for his anxiety disorder at the time of their consultation and that psychopharmacology only provided minimal relief for patients with PTSD. *Ibid.* (¶¶ 67-68). Dr.

Zahedi also wrote that Walsh was unwilling to follow medication recommendations, even though Walsh was, at all times, cooperative with medication suggestions. *Ibid.* (¶¶ 67, 69). Currently, Walsh is on a third trial of psychiatric medications, all of which have done little to improve his symptoms. *Ibid.* (¶ 69). Walsh alleges defendants, and presumably Dr. Zahedi, failed to account for various psychiatric treatise, journals, and expert research, which suggest that "a reduction of the environmental stress . . . is the main course of treatment to improve [psychiatric] symptoms." *Id.* at 17-18 (¶ 70).

On October 19, 2017, Walsh sent a letter to Gallagher explaining that his meeting with Dr. Zahedi "was very frustrating because [Dr. Zahedi] was completely focused on pharmacological therapy, . . . was unaware of [Walsh's medical] history, and showed little interest in hearing about the numerous medications [Walsh] had already been prescribed over multiple years." *Id.* at 18 (¶ 71). Weeks later, Gallagher met with Walsh and explained that she had requested that Dr. Burns, not Dr. Zahedi, perform the psychiatric consultation. *Ibid.* (¶ 72). She stated that her specification was based on Dr. Burns' "reputation for thoroughness and his experience with trauma related psychiatric conditions." *Ibid.*

On December 18, 2017, Gallagher sent Walsh a letter in response to his report about Dr. Zahedi. *Ibid.* at 18-19 (¶ 73). Gallagher recommended that a treatment plan be developed for Walsh "that addresses the need for alternative therapies" as well as the medication options suggested by Dr. Zahedi. *Ibid.* Moreover, Gallagher recommended that Walsh be placed on single-cell status until his treatment plan was devised. *Ibid.* But Walsh was not placed on single-cell status, and his condition continued to worsen. *Id.* at 18-19 (¶ 73). Gallagher's recommendations were not followed, and Walsh's continued requests for assistance went unanswered. *Id*. at 19 (¶¶ 74-75).

Based on Zahedi's and Gallagher's recommendations, an initial "Mental Health Interdisciplinary Treatment Plan" was developed for Walsh on December 27, 2017. *Ibid.* (¶ 76). The plan articulated Walsh's diagnoses as severe anxiety disorder, PTSD, and Anti-Social Personality Disorder, and listed the lack of solitude and a single cell as "Obstacles to Treatment." *Ibid.* It recommended "a safe place where [Walsh] can work on reducing symptoms of anxiety and continue with somatic treatment." *Ibid.* The plan stated that Walsh was willing to take psychotropic medication and would continue to self-regulate with facility-provided programs. *Ibid.*

Walsh agreed with the statements in the treatment plan, which he signed. *Id.* at 19-20 (¶ 77). Coleman later marked the plan as "draft" dated "1/3/18," initialed it, and devised an altered treatment plan on December 31, 2017, without any further psychiatric evaluations or consultations with Walsh. *Id.* at 20 (¶ 78). In the altered plan, Dr. Coleman changed Walsh's diagnosis of severe anxiety disorder to an "unspecified anxiety disorder" and omitted PTSD as a diagnosis. *Ibid.* He also wrote in the "Obstacles to Treatment" section that it was Walsh's "decision not [to] pursue the full array of treatment options available." *Ibid.* Dr. Coleman wrote that Walsh suffered from an "altered mood" and "altered thought process" and he changed the "Objectives" section of the plan. *Ibid.* Dr. Coleman's altered version of the treatment plan was presented to Walsh on January 9, 2018, which Walsh refused to sign. *Ibid.* (¶ 79); *see also id*. at 21 (¶ 85).

In early 2018, Walsh retained Dr. Andrew Meisler, an assistant professor of psychiatry at Yale and an expert in clinical and forensic psychology, to evaluate him. *Id.* at 24 (¶ 96). Based on his review of Walsh's psychiatric history and his consultations with Walsh, Dr. Meisler diagnosed Walsh with chronic and severe PTSD, recurrent major depressive disorder, and, likely,

10

bipolar disorder. *Id.* at 24, 34 (¶ 97).[1] Dr. Meisler opined, "with a reasonable degree of psychological certainty, that single-cell status is a reasonable accommodation for [Walsh's] condition." *Ibid.* In his written letters and requests, Walsh informed Semple, Chapdelaine, Coleman, Gallagher, Mulligan, and other DOC officials and medical personnel that his condition created a risk that he would cause serious physical harm to himself or other inmates as a result of being confined in a double cell. *Id.* at 34, 25 (¶ 98).

On May 3, 2018, during a conference at the Connecticut Superior Court on a separate matter, Walsh met with Dr. Burns and an attorney from the Connecticut Attorney General's Office, who was representing the defendants in this case. *Id.* at 20-21 (¶ 81). It was agreed that Dr. Burns would administer a "comprehensive psychiatric evaluation" of Walsh by September 2018. *Ibid.* In June or July of 2018, Dr. Burns visited MWCI and reviewed Walsh's mental health file, but he did not administer the "comprehensive psychiatric evaluation" as promised. *Id.* at 21 (¶ 82). The defendants' later explanation for why Dr. Burns had not administered the evaluation was that their "expert was unavailable." *Ibid.* (¶ 83).

In September 2018, Gallagher e-mailed Milna Rosario of the MWCI's Mental Health and Addiction Services and inquired why there had not been an active treatment plan signed by Walsh. *Id.* at 21-22 (¶ 85). Rosario explained that, although Walsh signed the initial plan based on Gallagher's and Dr. Zahedi's recommendations, he refused to sign the altered plan devised by Dr. Coleman. *Ibid.* Gallagher instructed Rosario to develop a treatment plan that Walsh was willing to sign. *Ibid.*

On September 22, 2018, per Gallagher's instructions, Rosario drafted a new treatment plan. *Id.* at 22 (¶ 86). The treatment plan correctly listed Walsh's diagnoses, goals and objectives.

---

[1] Page 25 in Walsh's amended complaint was scanned out of order, so the citations to page numbers throughout this ruling refer to the pagination generated by ECF.

*Ibid.* The plan also stated, "Custody will provide [Walsh] with permanent [single-cell status]." *Id.* at 29 (¶ 109). Walsh agreed with this plan and signed off on it. *Id.* at 22 (¶ 86). The next day, Rosario forwarded a copy of the signed plan to Gallagher, who did not express any issues or concerns. *Ibid.* (¶ 87). But on October 6, 2018, unbeknownst to Walsh, Coleman directed Rosario to amend the plan to state that Walsh "has not been promised, approved or authorized for permanent single-cell status with the creation of this treatment plan." *Id.* at 22-23 (¶ 88).[2]

Due to his worsening psychiatric symptoms, Walsh began another trial prescription of psychotropic medication in January 2019, which had little effect on his condition. *Id.* at 23 (¶ 91).[3] On January 10, 2019, Walsh attempted to verbally address his deteriorating mental health condition with Warden Mulligan, who was visiting his housing unit. *Id.* at 23 (¶ 89). Walsh stated that he had filed requests for a reasonable accommodation and other requests to be placed on single-cell status and receive facility transports. *Ibid.* Mulligan requested that Walsh forward him a correspondence outlining his issues. *Ibid.* Walsh then forwarded a letter to Mulligan two days later addressing his concerns, but he did not receive an immediate response. *Ibid.* (¶ 90). He sent a follow-up letter on February 18, 2019, to which Mulligan responded with the following:

> I reviewed your request with [mental health] staff [and] must point out some inaccurate or omitted information. First off, the temp[orary] [single-cell] status was granted in order for you to re-engage [mental health] services. [I]t was not permanent. [Y]ou also omitted an addendum to the treatment plan that indicated you were not approved or authorized permanent [single-cell status] as a result of the treatment plan.

---

[2] Walsh alleges in his amended complaint that "[o]n October 6, 2018, it was Coleman, not Gallagher, who interfered (for the second time) with [his] prescribed Treatment Plan…and directed Rosario to append the September 22, 2018 Treatment Plan," and that this Court mistakenly stated in its initial review order that it was Gallagher who directed Rosario to amend the September 22, 2018 plan. Doc. #9 at 22-23 n.11 (¶ 88); *see also* Doc. #8 at 10.

[3] One month later, he requested an increase in the dosage of his medication due to increased anxiety over a change in cellmates, diminishing ability to self-regulate, and no change in his other psychiatric symptoms. *Id.* at 24 (¶ 94).

*Id.* at 23-24 (¶¶ 92-93). But Walsh had been unaware of any addendum to his mental health treatment plan. *Id.* at 24 n.12 (¶ 93). When Walsh verbally inquired about Mulligan's reply letter in March of 2019, Mulligan told him that he has "never been a problem," and dismissed Walsh's concerns. *Id.* at 27 (¶ 103).

Walsh continued to endure exacerbated symptoms associated with his psychiatric problems. *Id.* at 28-29 (¶ 109). Moreover, Walsh cancelled two scheduled medical appointments at the UConn Health Center on June 1, 2018, and May 7, 2019, due to increased anxiety over traveling in a CTU van and prolonged confinement in holding cells. *Ibid.* Because of the environmental stress of being in a double cell and the anxiety relating to anticipated CTU trips, he struggles with self-regulation and cannot get relief. *Id.* at 28 (¶¶ 105-109). Walsh continues to pursue all recommended and prescribed treatment options available under the operative treatment plan, including psychotropic medications. *Id.* at 28-29 (¶ 109). The DOC will not grant Walsh permanent single-cell status, despite Dr. Zahedi's and Gallagher's recommendations and Walsh's prior temporary single-cell status. *Ibid.*

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

In his amended complaint Walsh reasserts his claim that the defendants acted with deliberate indifference to medical needs, in violation of the Eighth Amendment's protection against cruel and unusual punishment. Doc. #9 at 30-33, 35 (¶¶ 112-17). Walsh again claims that defendants subjected him to discrimination under the ADA and Rehabilitation Act by denying him permanent single-cell status and solo transports outside MWCI. *Id*. at 35 (¶¶ 118-33). He seeks monetary, injunctive, and declaratory relief. *Id.* at 36.

*Eighth Amendment*

In my prior initial review order, I outlined the standard that governs a prisoner's Eighth Amendment claim for deliberate indifference to serious medical needs:

> The Supreme Court has held that a prison official's deliberate indifference to the serious medical needs of a prisoner amounts to a violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Second Circuit has in turn made clear that a prisoner who claims deliberate indifference to a serious medical need must satisfy two requirements. First, there is an *objective* requirement—that the prisoner's medical need was sufficiently serious. *See Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). The prisoner must show that he suffered from an urgent medical condition involving a risk of death, degeneration, or extreme pain. *See Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011). Second, there is a *subjective* requirement: that

> the defendant has acted recklessly—that is, with an actual awareness of a substantial risk that serious harm to the prisoner would result from the defendant's action or non-action. *See Spavone*, 719 F.3d at 138. It is not enough to allege simple negligence or negligent medical malpractice. *See Hilton v. Wright*, 673 F.3d 120, 127 (2d Cir. 2012) (*per curiam*); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). Instead, a prisoner must show that the defendant acted with the equivalent of a criminally reckless state of mind when denying treatment for the prisoner's medical needs. *See Collazo v. Pagano*, 656 F.3d 131, 135 (2d Cir. 2011) (*per curiam*).

Doc. #8 at 12.

Although Walsh has alleged facts showing that he suffers from several severe mental health problems, I previously dismissed his Eighth Amendment claim because the facts alleged in the initial complaint did not plausibly establish that any of the defendants recklessly disregarded a substantial risk that he would suffer serious harm as a result of denying his numerous requests for single-cell status and/or solo facility transports. *Id.* at 13. For example, the facts as alleged showed a difference in opinion among Walsh's mental health care providers as to whether single-cell status was necessary to help treat his condition, which is insufficient to show an Eighth Amendment violation. *Id.* at 13-14 (citing *Hill*, 657 F.3d at 123).

Walsh's amended complaint does little to cure this factual deficiency. His Eighth Amendment claim against the defendants continues to be based on their failure to respond to several written requests for immediate evaluation, permanent or extended single-cell status, and solo facility transports. Doc. #9 at 30-33 (¶¶ 112-16). As I stated in my initial review order, however, the responses to Walsh's requests, while not always prompt, showed that the defendants reviewed and analyzed his requests for single-cell status. Doc. #8 at 13. The amended complaint also shows that Walsh continues to receive mental health care for his conditions. *Ibid*.

Moreover, that Walsh informed many of the defendants that the denial of his request for single-cell status could result in Walsh's harming himself or others does not mean that the

15

defendants were obligated under the Eighth Amendment to accept Walsh's opinion over that of Dr. Zahedi, who concluded that single-cell status "would do little to improve symptoms associated with [Walsh's] psychiatric condition." Doc. #9 at 16-17 (¶ 67). At best, Walsh has alleged facts to show no more than negligence and a difference of opinion among medical experts. Walsh has still not alleged facts showing that any of the defendants acted with intentional or reckless disregard for his health or safety with respect to his requests for single-cell status and solo facility transports. Therefore, as before, I will dismiss his Eighth Amendment claim against all the defendants on the ground that Walsh has not alleged plausible grounds for relief under the Eighth Amendment.

Moreover, because the DOC is an entity of the State of Connecticut, the DOC is not a "person" subject to suit for a violation of the Constitution under 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012). For this additional reason, I will dismiss Walsh's section 1983 claim against the DOC for a violation of the Eighth Amendment.

### *ADA and Rehabilitation Act*

In my prior initial review order, I permitted Walsh's ADA and Rehabilitation Act claims to proceed insofar as Walsh sought a grant of injunctive relief against individual defendants in their official capacities for failure to accommodate his disabilities.[4] Walsh has now amended his complaint to assert ADA and Rehabilitation Act claims against the DOC and against Barone in his official capacity.

---

[4] As noted in my prior initial review order, to the extent Walsh seeks money damages pursuant to his ADA or Rehabilitation Act claims against any of the individual defendants in their individual capacity, his claims may not be maintained. *See, e,g., Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *Fowler v. Dep't of Correction*, 2019 WL 2176304, at *3 (D. Conn. 2019).

As an initial matter, because the amended complaint requests injunctive relief against the DOC and all defendants Walsh has sued *only* in their official capacities, I again understand Walsh to limit his ADA and Rehabilitation Act claims to a request for injunctive relief only. Docs. #9 at 36; #8 at 15.[5] I therefore need not determine whether Walsh's alleged ADA and Rehabilitation Act violations also amount to a Constitutional violation such that a claim for monetary damages against a state or an individual in their official capacity would be permitted. *See United States v. Georgia*, 546 U.S. 151, 159 (2006) ("insofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity"); *Fowler v. Dep't of Correction*, 2019 WL 2176304, at *3 (D. Conn. 2019). I therefore again conclude that Walsh's claim for injunctive relief for failure to accommodate his disabilities may proceed against Cook in his official capacity. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (applying the doctrine originated in *Ex parte Young*, 209 U.S. 123 (1908), to ADA and Rehabilitation Act claims). I will also permit Walsh's new official capacity claim against Barone to proceed for the same reason. But in light of Barone's replacement of Mulligan as warden at MWCI as well as Barone's replacement of Mulligan as a defendant against whom Walsh seeks injunctive relief, I will dismiss Mulligan as an official capacity defendant.

Whether Walsh may *also* maintain a claim for injunctive relief against the DOC as a state entity under the ADA and the Rehabilitation Act is less than clear. The Second Circuit has held that claims under the ADA and Rehabilitation Act may be properly asserted against the DOC as a "public entity" defendant, but the court did so without considering the question of sovereign immunity or the Eleventh Amendment. *See Wright v. New York State Dep't of Corr.*, 831 F.3d

---

[5] In contrast, as I also noted in my initial review order, Walsh seeks money damages relief only from those defendants he sues in their individual capacities *in addition* to their official capacities. Doc. #9 at 36.

64, 72 (2d Cir. 2016); *Urbanski v. Lambert*, 2019 WL 3067287, at *2 (D. Conn. 2019). The Second Circuit has also distinguished between claims for injunctive relief against individual state officials in their official capacity and claims against a state entity in light of the Eleventh Amendment and sovereign immunity. *See, e.g.*, *Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 166 (2d Cir. 2013) (remanding with instructions to the district court to allow the plaintiff leave to amend her complaint to name an individual state official in their official capacity as defendant, rather than NYSLRS, in an attempt to invoke the doctrine of *Ex parte Young* to seek injunctive relief under the ADA); *McNiece v. Connecticut*, 692 F. App'x 655, 656 (2d Cir. 2017) (dismissal of the injunctive claim against the state of Connecticut was proper because McNiece did not sue an individual officer for violating the ADA).[6]

Ultimately, my decision that Walsh's ADA and Rehabilitation Act claims may proceed does not require me to resolve this question. Because an official capacity lawsuit against a state official is tantamount to a claim against the State itself, I find that Walsh's claims against the DOC *and* the individual defendants in their official capacities are redundant. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 287-88 (2d Cir. 2003) ("The real party in interest in an official-capacity suit is the government entity. . . . [S]ince the suit is in effect against the "public entity," it falls within the express authorization of the ADA."); *see, e.g.*, *Fowler*, 2019 WL 2176304, at *3 (dismissing official capacity claims as redundant in light of claims against DOC); *Currytto v. Doe*, 2019 WL 2062432, at *6 (D. Conn. 2019); *Demski v. Town of Enfield*, 2015 WL 4478401,

---

[6] District courts have tended to simply hold that a plaintiff "may, however, bring a Title II ADA claim against a state or its agent in its official capacity for injunctive relief." *Aviles v. Rodriguez*, 2019 WL 5695955, at *3 (D. Conn. 2019) (citing *Harris*, 572 F.3d at 72); *see also, e.g., Currytto*, 2019 WL 2062432, at *6 ("A plaintiff may also bring an official capacity suit against a state or its agent under § 504 of the Rehabilitation Act."); *Fowler*, 2019 WL 2176304, at *3 (same).

at *3 (D. Conn. 2015). Accordingly, I will dismiss Walsh's claim for prospective injunctive relief under the ADA and the Rehabilitation Act against the DOC as duplicative.

CONCLUSION

In accordance with the foregoing analysis, the Court enters the following orders:

(1) Walsh's amended complaint (Doc. #9) is now the operative complaint in this case. The Clerk of Court shall add defendants Connecticut Department of Correction and Kristine Barone as named defendants in this action.

(2) The Court DISMISSES Walsh's Eighth Amendment claim against all defendants.

(3) The Court DISMISSES Walsh's claims under the Americans with Disabilities Act and under the Rehabilitation Act against all defendants except for defendants Rollin Cook and Kristine Barone in their official capacities. Walsh's ADA and Rehabilitation Act claims for injunctive relief may proceed against defendants Cook and Barone in their official capacities only.

(4) The Clerk shall prepare a summons form and send an official capacity service packet, including the amended complaint (Doc. #9) to the United States Marshal Service. The U.S. Marshal is directed to effect service of the complaint on the defendants in their official capacities at the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141 within **twenty-one (21) days of the date of this Order**, and to file a return of service within **thirty (30) days of the date of this Order**.

(5) The Clerk shall send a courtesy copy of the amended complaint and this Order to the DOC Office of Legal Affairs.

(6) The defendants shall file their response to the amended complaint within **twenty-one (21) days after service**.

19

(7) Discovery shall be completed within **six months (180 days) from the date of this Order**. Discovery requests need not be filed with the Court.

(8) All motions for summary judgment shall be filed within **seven months (270 days) from the date of this Order**.

(9) All other previously entered orders remain in effect.

It is so ordered.

Dated at New Haven, Connecticut this 4th day of December 2019.

                                           /s/*Jeffrey Alker Meyer*
                                           Jeffrey Alker Meyer
                                           United States District Judge