UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PATRICK WALSH,<br>        *Plaintiff*, | |
| v. | No. 3:19-cv-980 (JAM) |
| DR. JOSEPH COLEMAN, *et al*.,<br>        *Defendants*. | |

**ORDER DENYING MOTION TO DISMISS AND GRANTING IN PART MOTION FOR
LEAVE TO AMEND COMPLAINT**

Plaintiff Patrick Walsh is a sentenced prisoner in the custody of the Connecticut

Department of Correction ("DOC"). Walsh has filed this lawsuit *pro se* alleging a number of

violations of his rights by the DOC and numerous state prison officials arising from their alleged

failure to accommodate his requests for single-cell status and for special facility transport

arrangements when it is necessary for him to leave his prison facility for medical or legal

reasons.

In my initial review order, I allowed Walsh's claims to proceed against defendants Cook

and Barone in their official capacities on the theory that they have failed to provide a reasonable

accommodation for his disabilities under the Americans with Disabilities Act ("ADA"), 42

U.S.C. §§ 12131, *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794 *et seq*. Now Cook and

Barone move to dismiss those claims. Because I find that Walsh has alleged a plausible claim for

failure to accommodate under the ADA and the Rehabilitation Act, I will deny the motion to

dismiss.

In addition, Walsh moves for leave to amend his complaint for a second time. Walsh's

proposed second amended complaint adds new parties who were previously dismissed, restates

claims under the Eighth Amendment, adds equal protection and due process claims brought

under the Fourteenth Amendment, and adds claims for money damages for the alleged violations of the constitution, ADA, and Rehabilitation Act. I conclude that Walsh's new claims are each futile except for his claim against the DOC for money damages under the Rehabilitation Act. Accordingly, I will grant Walsh's motion for leave to file his second amended complaint only to the extent it adds a claim for money damages against the DOC under the Rehabilitation Act.

## BACKGROUND

Walsh's claims arise from his confinement at the MacDougall-Walker Correctional Institution ("MWCI"). He filed an initial complaint in June 2019, alleging claims under the Eighth Amendment, the ADA, and the Rehabilitation Act against the following defendants: DOC Commissioner Rollin Cook; MWCI Wardens Carol Chapdelaine and William Mulligan; Deputy Warden Gerald Hines; Dr. Joseph Coleman; and DOC Health and Addiction Services Head Colleen Gallagher. Doc. #1. In July 2019, I issued an initial review order dismissing the Eighth Amendment claims and allowing the ADA and Rehabilitation Act claims to proceed against two of the defendants—Cook and Mulligan—in their official capacities only for injunctive relief. Doc. #8; *Walsh v. Coleman*, 2019 WL 3231194 (D. Conn. 2019).

Walsh then filed an amended complaint as of right pursuant to Fed. R. Civ. P. 15 that named the same defendants but that also included two more defendants: the DOC and Kristine Barone (the current warden of MWCI), who is sued in her official capacity only. Doc. #9. In my initial review order of Walsh's amended complaint issued in December 2019, I once again dismissed Walsh's Eighth Amendment claims, while allowing Walsh's ADA and Rehabilitation Act claims to proceed, this time against only Cook and Barone, who had replaced Mulligan as warden of MWCI. Doc. #10; *Walsh v. Coleman*, 2019 WL 6529825, at *9 (D. Conn. 2019).

2

The following facts are derived from the allegations in the amended complaint, Doc. #9, and are accepted as true only for purposes of this ruling. Because the factual allegations in Walsh's first amended complaint are described at length in my initial review order, I assume the parties' familiarity with the facts referenced in that order and only briefly summarize them here.[1] *See Walsh*, 2019 WL 6529825, at *1-7.

Prior to his incarceration, Walsh was diagnosed with Post-Traumatic Stress Disorder ("PTSD"), depression, anxiety, mixed personality disorder, episodic alcohol abuse, and dysthymic disorder, and had been hospitalized and treated with various psychiatric medications. Doc. #9 at 4-5 (¶¶ 14-16). Walsh was arrested and admitted into DOC custody in August 1995, at which time he was evaluated by mental health personnel who incorporated his written medical history into his medical history file. *Id.* at 6. (¶¶ 21-23). In June 1999, Walsh was found guilty of murder and was later sentenced to a 55-year term of imprisonment. *Ibid.* (¶ 24). Although Walsh was regularly seen by DOC mental health staff and was prescribed numerous trials of psychiatric medications early in his incarceration, from 2003 to 2016 he did not receive any evaluation or treatment by mental health staff for his chronic conditions, and he was not prescribed any medications. *Ibid.* (¶¶ 25-26).

Walsh details extensive outreach to DOC leaders and mental health staff, beginning in August 2016, seeking single-cell status to address his worsening mental health symptoms since he transferred to MWCI in 2013. *Id.* at 7-10 (¶¶ 28-44). His initial outreach included letters to then-warden Carol Chapdelaine and then-Commissioner of Correction Scott Semple, inmate

---

[1] Because defendants' motion to dismiss was filed against Walsh's first amended complaint, this background section refers to allegations in that amended complaint. With limited exceptions noted in the section of this ruling that addresses the motion for leave to file a second amended complaint, there are no material differences between the allegations in Walsh's first amended complaint and proposed second amended complaint.

requests to Dr. Joseph Coleman, and two Requests for Reasonable Accommodations ("RRAs"). *Id*. at 7-10 (¶¶ 29-44).

Much of this correspondence went unanswered, but in March 2017 Walsh was approved for "temporary single-cell status" for one to four months based on Dr. Coleman's recommendations, which also stated that there were no clinical reasons for permanent single-cell status. *Id*. at 7-11 (¶¶ 31-44). That same month, Walsh also filed his third RRA, requesting that he receive "[f]acility transport to and from [c]ourt and/or medical trips" because of his mental health conditions.[2] *Id.* at 10 (¶ 43). Walsh has cancelled two scheduled medical appointments at the UConn Health Center due to increased anxiety over traveling in a Central Transportation Unit ("CTU") van and prolonged confinement in holding cells. *Id.* at 28-29 (¶ 109).

While temporarily in single-cell status, Walsh continued to advocate for extended or permanent single-cell status and facility transport, but these requests were denied, and Walsh's temporary single-cell status expired after three months in June 2017. *Id.* at 12-14 (¶¶ 47-58). In July 2017, Walsh filed a grievance and an ADA appeal contesting the revocation of his single-cell status. *Id.* at 15 (¶ 60, 62).

As part of his ADA appeal, Walsh underwent an "Initial Psychiatric Evaluation" by Nurse Lea Pannella, met with Gallagher, and underwent a "Psychiatric Consultation" with Dr. Sohrab Zahedi. *Id.* at 15-17 (¶¶ 61-67). Walsh expressed frustration with Dr. Zahedi's evaluation and recommendations, which focused on medication treatments that have done little to improve his symptoms. *Id*. at 16-18 (¶¶ 67-71). Dr. Zahedi agreed with Walsh that his risk of aggression

---

[2] "Facility transport" provides a prisoner with a "direct and private ride" from the facility to a court or medical appointment, in contrast to CTU transport, which involves group transportation of numerous inmates. Doc. #9 at 10 n.2.

would be improved through single-cell status, although he opined that single-cell status "would do little to improve symptoms associated with his psychiatric condition." *Id.* at 16-17 (¶ 67).

In December 2017, Gallagher recommended that a treatment plan be developed for Walsh "that addresses the need for alternative therapies" as well as the medication options suggested by Dr. Zahedi, and that Walsh be placed on single-cell status until his treatment plan was devised. *Id.* at 18-19 (¶ 73). But Walsh was not placed on single-cell status, and his condition continued to worsen. *Ibid.*

An initial "Mental Health Interdisciplinary Treatment Plan" was developed for Walsh later that month. *Ibid.* (¶ 76). The plan articulated Walsh's diagnoses as severe anxiety disorder, PTSD, and Anti-Social Personality Disorder, and listed the lack of solitude and a single cell as "Obstacles to Treatment." *Ibid.* It recommended "a safe place where [Walsh] can work on reducing symptoms of anxiety and continue with somatic treatment." *Ibid.* The plan stated that Walsh was willing to take medication and would continue to use facility-provided programs. *Ibid.* Walsh agreed with the statements in the treatment plan and signed it. *Id.* at 19-20 (¶ 77). However, Dr. Coleman subsequently marked that plan a "draft" and altered Walsh's diagnosis and treatment plan, which Walsh refused to sign. *Id.* at 20 (¶¶ 78-79); *see also id.* at 22 (¶ 85).

In early 2018, Walsh retained Dr. Andrew Meisler, an expert in clinical and forensic psychology, to evaluate him. *Id.* at 24 (¶ 96). Dr. Meisler diagnosed Walsh with chronic and severe PTSD, recurrent major depressive disorder, and, likely, bipolar disorder. *Id.* at 34 (¶ 97).[3] Dr. Meisler opined, "with a reasonable degree of psychological certainty, that single-cell status is a reasonable accommodation for [Walsh's] condition." *Ibid.*

---

[3] Page 25 in Walsh's amended complaint was scanned out of order, so the citations to page numbers throughout this ruling refer to the pagination generated by ECF.

In May 2018, Walsh, psychiatrist Dr. Burns, and an attorney from the Connecticut Attorney General's Office agreed that Dr. Burns would administer a "comprehensive psychiatric evaluation," but although Dr. Burns reviewed Walsh's mental health file, he did not administer the evaluation. *Id.* at 20-21 (¶¶ 81-83).

As Walsh still did not have an active treatment plan as of September 2018, Milna Rosario of the MWCI's Mental Health and Addiction Services developed one, at Gallagher's instruction, that correctly listed Walsh's diagnoses, goals, and objectives, and stated, "Custody will provide [Walsh] with permanent [single-cell status]." *Id.* at 21-22, 29 (¶¶ 85-86, 109). Walsh agreed with this plan and signed off on it. *Id.* at 22 (¶ 86). But unbeknownst to Walsh, Dr. Coleman directed Rosario to amend the plan to state that Walsh "has not been promised, approved or authorized for permanent single-cell status with the creation of this treatment plan." *Id.* at 22-23 (¶ 88).

Due to worsening psychiatric symptoms, Walsh began another trial prescription of psychotropic medication in January 2019, which had little effect on his condition. *Id.* at 23 (¶ 91).  He also reached out to Warden Mulligan, verbally and through letters, about his unaddressed requests for single-cell status and facility transports. *Id.* at 23 (¶¶ 89-92). Mulligan responded in February 2019 that his single-cell status had been only temporary, and that an addendum to the treatment plan—which Walsh was unaware of—indicated he was not approved or authorized for permanent single-cell status. *Id.* at 23-24 (¶ 93). When Walsh verbally inquired about Mulligan's reply letter in March of 2019, Mulligan told him that he has "never been a problem," and dismissed Walsh's concerns. *Id.* at 27 (¶ 103).

Walsh continues to suffer due to his mental health disability and the environmental stress of being in a double cell and the anxiety relating to anticipated CTU trips. *Id.* at 28 (¶ 105). But the DOC will not grant Walsh permanent single-cell status or facility transport despite his

repeated requests, ongoing psychiatric issues, and compliance with his operative treatment plan. *Id.* at 28-29 (¶ 109).

Following my initial review order, the two remaining defendants—Barone and Cook— filed a motion to dismiss Walsh's ADA and Rehabilitation Act claims for failure to state a claim upon which relief can be granted in February 2020. Doc. #20. Walsh filed his opposition to that motion in April 2020. Doc. #23.

In addition, on June 1, 2020, while the fully briefed motion to dismiss was still pending and discovery was set to close, Walsh filed a motion for leave to file a second amended complaint to add new claims and new parties. Docs. #24; #24-1 (proposed second amended complaint).[4] Defendants oppose this motion on the grounds that the new claims would be futile, that Walsh has failed to demonstrate any good cause or reason for the delay in filing his motion for leave to amend, and that allowing such action now would be prejudicial to the defendants. Doc. #27. Walsh has filed a reply. Doc. #28.

**DISCUSSION**

*Defendants' motion to dismiss*

When considering a motion to dismiss under Rule 12(b)(6), a court must accept as true all factual matters alleged in a complaint, although a complaint may not survive unless it recites enough non-conclusory facts to state plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As the Supreme Court has explained, this "plausibility" requirement is "not akin to a probability requirement," but it "asks for more than a sheer possibility that a

---

[4] Because Walsh was a prisoner at the time that he filed his motion, he is entitled to the benefit of the prison mailbox rule. *See Heckerman v. NYS Div. of Parole*, 461 F. App'x 48, 49 (2d Cir. 2012). Accordingly, Walsh's motion is deemed as filed on June 1, 2020 rather than June 4, 2020, which was the day it was docketed by the Clerk's Office.

defendant has acted unlawfully." *Ibid.* In other words, a valid claim for relief must cross "the line between possibility and plausibility." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

If the plaintiff is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

The Second Circuit has explained that in order to establish a *prima facie* violation under the ADA and Rehabilitation Act, a plaintiff must show that (1) "he is a qualified individual with a disability"; (2) "[the defendant] is an entity subject to the acts"; and (3) "he was denied the opportunity to participate in or benefit from [the defendant's] services, programs, or activities or [the defendant] otherwise discriminated against him by reason of his disability."[5] *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (internal citation omitted). For the purpose of their motion to dismiss, defendants do not contest that Walsh is a qualified individual under the first prong or that defendants are subject to the acts under the second prong. *See* Doc. #20-1 at 10.

There are "three available theories" of discrimination that can be used to establish the third prong of an ADA and Rehabilitation Act claim: "(1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009); *see also Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d

---

[5] I evaluate Walsh's ADA and Rehabilitation Act claims using the same analysis because they do not implicate the subtle distinctions between the statutes, although as discussed below the availability of damages may vary between the statutes. *See Wright*, 831 F.3d at 72 ("Because the standards under both statutes are generally the same and the subtle distinctions between the statutes are not implicated in this case, we treat claims under the two statutes identically.") (internal quotations omitted).

565, 573 (2d Cir. 2003) (explaining that the ADA requires covered entities to make "reasonable accommodations in order to provide qualified individuals with an equal opportunity to receive benefits from or to participate in programs run by such entities.") (citations omitted).

Walsh brings his claims under a failure-to-accommodate theory of liability. *Walsh*, 2019 WL 6529825, at *9. Walsh claims that his disability (his numerous mental health conditions) prevents him from accessing medical services without single-cell status and solo transport. As a result, when defendants declined to provide him with single-cell status and solo transport when it was necessary for him to leave his prison facility for medical reasons, Walsh was "denied access to, and excluded from receiving the benefits of medical services." Doc. #9 at 35 (¶¶ 120-21).

Defendants make three primary arguments in support of their motion to dismiss for failure to state a claim under the ADA and Rehabilitation Act. First, they argue that Walsh's claim "revolves around a disagreement in the course of his mental health treatment," and because Walsh fails to allege "that he has been treated differently due to his mental health conditions," his ADA and Rehabilitation Act claims should be dismissed. Doc. #20-1 at 10.

It is true that the ADA and Rehabilitation Act do not "appl[y] to claims regarding the quality of mental health services," *Maccharulo v. N.Y. State Dep't of Corr. Servs.*, 2010 WL 2899751, at *2 (S.D.N.Y. 2010), unless the provider relied "on factors that are unrelated to, and thus improper to consideration of the inquiry in question[,]" *McGugan v. Aldana-Bernier*, 752 F.3d 224, 234 (2d Cir. 2014) (internal quotation omitted). If Walsh had brought his claim *only* under an intentional discrimination theory of liability, resting solely on his disagreement with the particular mental health services he has received, I might well agree with defendants' argument for dismissal. This is because under an intentional discrimination theory, Walsh would need to plausibly allege not only that he was denied access to services in the form of single-cell status

and solo transport, but also that he was treated differently and denied those services specifically *because of* his disability. *See Mercado v. Dep't of Corr.*, 2018 WL 2390139, at *11 (D. Conn. 2018); *see also Cordero v. Semple*, 696 F. App'x 44, 45 (2d Cir. 2017) (affirming the dismissal of an ADA claim by a prisoner suffering from HIV and mental disorders who sought a single cell because the prisoner "did not allege that his conditions prevented him from participating in any programs or activities"); *Elbert v. N.Y. State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010) ("Courts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability.").

But Walsh brings his claim under a failure-to-accommodate theory. Walsh is not just claiming that he was denied access to prison services of single-cell status and solo transport; rather, he claims that single-cell status and solo transport are the accommodations he seeks so that he can access medical services notwithstanding his disability. For initial pleading purposes, I cannot rule out that single-cell status or solo transports constitute accommodations for purposes of the ADA and Rehabilitation Act that are necessary for Walsh to access his mental health services as he alleges. Therefore, I will deny defendants' motion to dismiss to the extent it is based on the argument that Walsh's claim arises only from his disagreement with the particular medical treatment he has received.

Second, defendants argue that Walsh's allegations "fail to reveal that he was excluded from, or denied the opportunity to participate in or benefit from, any program, service, or activity offered by the defendants" because his complaint makes clear he was able to obtain medical and mental health services. Doc. #20-1 at 14-16. In other words, despite the denial of his request for accommodations in the form of single-cell status and solo transport, defendants argue that Walsh

was not actually excluded from receiving medical services because of his disability or their failure to accommodate his disability.

The Second Circuit has explained that "a reasonable accommodation need not be perfect or the one most strongly preferred by the plaintiff, but it still must be effective." *Wright*, 831 F.3d at 72 (cleaned up). "In examining [a reasonable accommodation] claim, we ask whether a plaintiff with disabilities as a practical matter was denied meaningful access to services, programs or activities to which he or she was legally entitled." *Ibid.* (internal quotation omitted).

It is evident from the amended complaint that Walsh has received some medical and mental health services. But whether denying Walsh reasonable accommodation of single-cell status and direct transport has deprived him of "meaningful access" to prison services to which he is legally entitled is a factual question inappropriate for me to resolve at the pleading stage. *See Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (explaining that determining the "reasonableness of an accommodation is a fact-specific question that often must be resolved by a factfinder.") (cleaned up).

For example, defendants point out that Walsh was not wholly denied medical care, and that it was Walsh who cancelled external medical appointments. Doc. #20-1 at 15-16. But Walsh's claim is that his mental health conditions render him unable to use group transport and his double-cell gave him anxiety, which is why he cancelled those appointments. Doc. #9 at 28-29 (¶ 109).

Accordingly, I will deny defendants' motion to dismiss to the extent it seeks dismissal on the ground that Walsh had meaningful access to medical services notwithstanding the denial of permanent single-cell status and solo transport. At this pleading stage, Walsh has sufficiently alleged that he has been deprived meaningful access to medical services without the reasonable

11

accommodation of solo transport and single-cell status. My conclusion in this respect is without prejudice to reconsideration of this issue on a summary judgment or trial record.

Third, Defendants argue "[e]ven if the Court finds that the plaintiff has plausibly alleged the denial of some program, service, or activity due to the defendants' denial of the plaintiff's requests, he still cannot maintain his reasonable accommodation claim as the plaintiff's requested accommodations are simply not reasonable, especially in the prison context." Doc. #20-1 at 17. Defendants then discuss at length how any accommodation of Walsh with single-cell status or solo transportation is unreasonable under the burden-shifting framework for ADA and Rehabilitation Act claims in the prison context, ultimately urging that prison officials deserve some deference to their judgment of whether a particular accommodation presents an undue hardship to the DOC. *Id*. at 17-20.

Undue hardship is a question of fact. *Wright*, 831 F.3d at 76-77. As with the question of whether Walsh was deprived of meaningful access, it would be premature to opine on the reasonableness of any accommodation in the absence of a factual record. *See Fulton*, 591 F.3d at 44 (explaining that assessing the reasonableness of an accommodation "requires a fact-specific, case-by-case inquiry not only into the benefits of the accommodation but into its costs as well") (internal quotations omitted). And the burden-shifting framework urged by defendants is appropriately considered at the summary judgment stage, as even the case cited by defendants for that point illustrates. *See Wright*, 831 F.3d at 76-77.

Accordingly, defendants' third argument for dismissal also falls short, and I will deny their motion to dismiss for failure to state a valid claim under the ADA and Rehabilitation Act.

### *Motion for leave to amend complaint*

Walsh filed a motion for leave to file a second amended complaint on June 1, 2020, while

the fully briefed motion to dismiss was still pending. Docs. #24; #24-1 (proposed second amended complaint). Compared to the first amended complaint, the proposed second amended complaint contains nearly identical factual allegations, seeks to reinstate claims against each of the same defendants, names Barone and Cook in their individual capacities as well as their official capacities, and restates the same legal claims while also adding new claims.

I evaluate Walsh's motion under Rule 15, which provides that the court "should freely give leave [to amend] when justice so requires."[6] Fed. R. Civ. P. 15(a). "[W]here, as here, a plaintiff moves for leave to amend his complaint to add new claims and parties, a court will look to whether the opposing party is unduly prejudiced, whether plaintiff has unduly delayed in seeking the proposed amendment, and whether the proposed amendment would be futile." *Brown v. Dirga*, 2016 WL 6080618, at *2 (D. Conn. 2016) (citing *Jin v. Metro. Life Ins. Co*., 310 F.3d 84, 101 (2d Cir. 2002)).

Beginning with futility, a court may deny leave if a proposed amendment to a complaint "could not withstand a motion to dismiss." *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164–65 (2d Cir. 2015) (internal quotation omitted); *see also Nwachukwu v. Liberty Bank*, 2016 WL 3647837, at *2 (D. Conn. 2016) ("An amendment is considered 'futile' if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis."). Accordingly, I will evaluate whether each of Walsh's claims would survive a motion to dismiss under Rule 12(b)(6). *See, e.g.*, *Garlington v. Clifford*, 2017 WL 3444676, at *2 (D. Conn. 2017) (assessing a proposed amended complaint in considering whether to grant leave to amend).

### A. *Eighth Amendment claims*

Walsh once again asserts Eighth Amendment claims against Coleman, Chapdelaine,

---

[6] Defendants submit that Walsh's motion should be denied under Rule 15, without making any contention that it is governed by the Rule 16 "good cause" standard because a scheduling order has been entered. *See* Doc. #27 at 3-4.

Gallagher, Hines, and Mulligan. Doc. #24-1 at 31-35. I have twice dismissed Walsh's Eighth Amendment claims against all defendants in my initial review orders, noting that Walsh's factual allegations "do not plausibly establish that any of the defendants recklessly disregarded a substantial risk that Walsh would suffer serious harm as a result of their conduct denying Walsh's requests." *Walsh*, 2019 WL 3231194, at *7; *see also Walsh*, 2019 WL 6529825, at *8 ("Walsh has still not alleged facts showing that any of the defendants acted with intentional or reckless disregard for his health or safety with respect to his requests for single-cell status and solo facility transports."). In his second amended complaint, the only new factual allegation Walsh adds to his Eighth Amendment claim is that prison officials have stopped providing him with Eye Movement Desensitization and Reprocessing therapy and that he is not being provided with psychiatric treatment. Doc. #24-1 at 36 (¶ 118). Adding an allegation that treatment has ceased, without more, still does not cure the factual deficiency as to whether defendants recklessly disregarded a substantial risk that he would suffer serious harm as a result of denying his numerous requests for single-cell status and/or solo facility transports. Accordingly, allowing Walsh leave to amend to add his proposed Eighth Amendment claims would be futile.

### B. Equal protection claim

Walsh's proposed second amended complaint includes a new equal protection claim against all defendants. Doc. #24-1 at 36. To state an equal protection claim, Walsh "must allege facts showing that: (1) he was treated differently from similarly situated individuals and (2) that the difference in or discriminatory treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Nicholson v. Hannah*, 2020 WL 3086022, at *5 (D. Conn. 2020) (citations omitted).

Walsh does not allege that he is a member of a protected class for equal protection purposes. I have held that, at least for initial pleading purposes, Walsh's allegations that he suffers from numerous mental conditions are sufficient to state a claim that Walsh is a qualified individual with a disability under the ADA and Rehabilitation Act. *Walsh*, 2019 WL 3231194, at *7; *see also Hargrave v. Vermont*, 340 F.3d 27, 36 (2d Cir. 2003) ("For purposes of the ADA, the term 'disability' includes '[a]ny mental or psychological disorder, such as ... emotional or mental illness.'") (quoting 29 C.F.R. § 1630.2(h)). Walsh claims that he is a "protected member of a subject class under the ADA." Doc. #28 at 4 (¶ 9). But the Supreme Court has held that disability is not a suspect classification under the Equal Protection Clause, explaining that "the Fourteenth Amendment does not require States to make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 357 (2001). And Walsh does not include factual allegations that suggest the denial of single-cell status and solo transport was irrational. Nor does Walsh allege that he was treated differently than any other similarly situated person. He alleges only that the DOC provides those accommodations to "problematic inmates, or inmates with behavioral problems," Doc. #24-1 at 36 (¶ 123), without making any allegation to suggest that he himself is an inmate with behavioral problems or otherwise a problematic inmate, as would be required to show that he is similarly situated to those inmates who are being provided with single-cell status and solo transport.

"Alternatively, an equal protection claim can sometimes be sustained if the plaintiff claims that he has been irrationally singled out as a class of one." *Nicholson*, 2020 WL 3086022, at *5 (internal quotations omitted). "To succeed on such a claim, plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare

themselves"; in other words, "such a plaintiff must be *prima facie* identical to the persons alleged to receive irrationally different treatment." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018) (internal quotations omitted). But Walsh's proposed second amended complaint makes no allegation to suggest that he was he was singled out for arbitrarily discriminatory treatment in being denied single-cell status and solo transport.

Because Walsh does not allege that he was treated differently than any other similarly-situated person on the basis of a suspect classification or that he was singled out for arbitrarily discriminatory treatment, his proposed second amended complaint does not state a plausible claim for relief under the Equal Protection Clause. Accordingly, I conclude that granting Walsh leave to include a new equal protection claim against all defendants would be futile.

### C. Due process claim

Walsh's proposed second amended complaint alleges that his constitutional rights were violated when his temporary single cell status ended, and he brings a due process claim against all defendants. Doc. #24-1 at 37 (¶¶ 129-33). The Due Process Clause of the Fourteenth Amendment protects both a right to "substantive" due process and "procedural" due process. *See County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998); *Wilson v. Santiago*, 2020 WL 1989135, at *3 (D. Conn. 2020).

A claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*). Substantive due process generally protects against the government's "exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento*, 523 U.S. at 846. "The first step

16

in substantive due process analysis is to identify the constitutional right at stake[,]" then the court must "consider whether the state action ... was arbitrary in the constitutional sense and therefore violative of substantive due process." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir. 1994). Thus, under either due process claim, Walsh must begin by alleging that he had a protected liberty interest, for he makes no suggestion that the conduct of which he complains implicates a property interest or some other constitutional right.

The Constitution does not guarantee a prisoner a right to a single cell. *See Germano v. Cook*, 2020 WL 264763, at *11 (D. Conn. 2020). In the prison context, which involves individuals whose liberty interests have already been severely restricted, a prisoner has a liberty interest protected under the Due Process Clause only if the state created such an interest in a statute or regulation and the deprivation of that interest caused him to suffer an atypical and significant hardship in relation to the ordinary incidents of prison life. *See Sandin v. Conner*, 515 U.S. 472, 484-88 (1995); *see also Tellier v. Fields*, 280 F.3d 69, 80 (2d Cir. 2000).

But Walsh does not allege that Connecticut has created a liberty interest in single-cell status by statute or regulation, let alone that the deprivation of which he complains is also atypical and significant. And several courts in this District have reasonably determined that single-cell status is not a liberty interest protected by the Due Process Clause, particularly in the absence of evidence that it is medically necessary. *See, e.g.*, *Jarecke v. Hensley*, 2009 WL 2030394, at *8 (D. Conn. 2009) (concluding no cognizable claim based on substantive due process right to single cell where plaintiff had not presented "any evidence that such an accommodation is medically required"); *Parks v. Lantz*, 2012 WL 1059696, at *14-15 (D. Conn. 2012) (insofar as plaintiff claims a right to be housed in a single cell at a particular facility, it is not a cognizable interest protected by the Due Process Clause); *see also Abrams v. Waters*, 2018

WL 1469057, at *5 (D. Conn. 2018) ("Pursuant to Connecticut law, prison officials are authorized to exercise their discretion to determine where an inmate will be incarcerated.") (citing Conn. Gen. Stat. § 18-86). Moreover, to the extent Walsh would base his due process claim on his allegations that the defendants told him there would be a review of his mental health before the end of his temporary single-cell status but failed to do so, he has no federally-protected liberty interest in the state's compliance with its own prison procedures. *See Brown v. Graham*, 470 F. App'x 11, 13 (2d Cir. 2012).

Accordingly, because Walsh's proposed second amended complaint does not allege a state-created interest in single-cell status (or solo transport), let alone that a deprivation would constitute a significant and atypical hardship, Walsh does not allege that he has a liberty interest protected by the Due Process Clause. Accordingly, I conclude that granting Walsh leave to amend his complaint to add a new due process claim would be futile.

### D.  ADA and Rehabilitation Act claims

As an initial matter, Walsh restates several ADA and Rehabilitation Act claims that I have previously dismissed without alleging any new factual allegations or making new arguments in support of these claims. Walsh restates ADA and Rehabilitation Act claims against Coleman, Chapdelaine, Gallagher, Hines, and Mulligan, Doc. #24-1 at 37, even though I have previously dismissed them twice. *Walsh*, 2019 WL 6529825, at *10; *Walsh*, 2019 WL 3231194, at *8. Walsh also seeks injunctive relief against the DOC under the ADA and Rehabilitation Act, Doc. #24-1 at 38, which I previously dismissed as duplicative of the injunctive relief Walsh seeks against Cook and Barone. *Walsh*, 2019 WL 6529825, at *9. And Walsh now seeks money damages against the defendants in their individual capacities (including Cook and Barone, who were previously sued in their official capacity only), Doc. #24-1 at 38, even though I have

previously explained that "the ADA and Rehabilitation Act permit suits only against individual defendants in their official rather than individual capacities." *See Walsh*, 2019 WL 3231194, at *7; *Walsh*, 2019 WL 6529825, at *8 n.4. Because Walsh does not offer any new factual allegations or arguments that warrant reinstating these claims, I conclude that allowing Walsh to amend his complaint to include these previously-dismissed claims would be futile.

Walsh's proposed second amended complaint also includes, for the first time, a money damages claim against the DOC. *See* Doc. #24-1 at 5 ("[t]he Defendant, Connecticut Department of Corrections, is being sued as a 'public entity' defendant, under the ADA and RA"); *id.* at 38 (seeking money damages for violations of ADA and Rehabilitation Act against all defendants).

The Supreme Court has held that Title II of the ADA validly abrogates state sovereign immunity insofar as it creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment. *See United States v. Georgia*, 546 U.S. 151, 159 (2006). Walsh's new due process and equal protection claims appear to be predicated on the same conduct—denial of single-cell status and solo transport—as his ADA and Rehabilitation Act claims. Therefore, to the extent that Walsh is attempting now to state a money damages ADA claim against the DOC, it would hinge on whether Walsh's proposed second amended complaint states a Fourteenth Amendment claim. Because it does not, as explained above, Walsh will not be able to maintain an ADA claim for money damages against the DOC.

But Walsh may be able to maintain a money damages claim against the DOC under the Rehabilitation Act. *See Barrett-Browning v. Connecticut Dep't of Correction*, 2019 WL 3412173, at *3 (D. Conn. 2019) ("In contrast to the ADA, however, a cause of action against the DOC for money damages under the Rehabilitation Act is not precluded by the Eleventh Amendment, because the State of Connecticut has waived its sovereign immunity by continued

19

acceptance of federal funds under the Act."). Accordingly, Walsh's new Rehabilitation Act claim for money damages against the DOC is not futile.

I next consider whether the other Rule 15 factors should bar Walsh from adding this new claim for money damages against the DOC. The defendants argue that Walsh has "failed to demonstrate any good cause or reason for the delay in asserting the new claims and allegations in his proposed amended complaint[,]" and that allowing such action now would be prejudicial to the defendants. Doc. #27 at 12-13. And they are correct that courts deny motions for leave to amend on these bases in some circumstances. *See, e.g., Brown v. Dirga*, 2016 WL 6080618, at *4 (D. Conn. 2016) (denying leave to file new complaint to add parties and amend claims based on undue delay, where motion was filed four days before close of discovery, the evidence at issue was known to plaintiff seven months prior, and adding new defendants and new claims would require the reopening of discovery); *Harris v. Lantz*, 2007 WL 963181, at *2 (D. Conn. 2007) (denying leave to file an amended complaint on prejudice and undue delay grounds, where plaintiff provided no explanation for his tardiness in raising the new claim and naming new defendants, and where permitting the amendment would "unreasonably delay resolution of the claims in the original complaint that have survived the motion to dismiss.").

Here, the sole claim at issue is Walsh's claim against the DOC for money damages, which he brings under the Rehabilitation Act. Although allowing this new claim to proceed would require adding the DOC, which was dismissed as a defendant in December 2019, this would not unfairly prejudice the DOC as it is on notice and effectively bound by this litigation under the Rehabilitation Act already. Indeed, when I dismissed Walsh's claim against the DOC for injunctive relief, I did so because it was duplicative of his claims for injunctive relief against defendants Cook and Barone in their official capacities. *See Walsh*, 2019 WL 6529825, at *9

(also noting "[b]ecause an official capacity lawsuit against a state official is tantamount to a claim against the State itself, I find that Walsh's claims against the DOC *and* the individual defendants in their official capacities are redundant.").

The Connecticut Attorney General's office will represent the DOC in this litigation, just as it has represented the defendants in their official capacities. And although Walsh filed his motion for leave to amend on the eve of the close of discovery, limited additional discovery—if any at all—will be needed for Walsh's money damages claim against the DOC since it is predicated on the same legal and factual claims as the ADA and Rehabilitation Act claims that have already been subject to discovery by the parties. Defendants raise concerns about how Walsh's proposed amended complaint would affect their "discovery strategy and needs" as it relates to the Eighth Amendment and Fourteenth Amendment claims, but do not raise any issues directly related to the Rehabilitation Act claim for money damages. Doc. #27 at 13-14. As a result, I conclude the defendants will not be unfairly prejudiced by allowing Walsh to make this limited amendment to his complaint.

Finally, I recognize that Walsh's motion for leave to amend is delayed, having been filed nearly six months after my Initial Review Order on his prior amended complaint, and that his new Rehabilitation Act claim for money damages against the DOC is not predicated on any facts that were not known at the time he filed his original and amended complaints. Walsh states his delay is due to his status as an unexperienced *pro se* litigant, challenges with accessing the prison law library due to COVID-19, and that he only discovered the new claims while writing his reply to the defendants' motion to dismiss. *See* Docs. #24; #28 at 2. In light of the limited nature of the viable part of the proposed amended complaint, the lack of unfair prejudice to DOC, and the

21

liberal approach to pleadings by *pro se* litigants and to motions for leave to amend under the Federal Rules of Civil Procedure, I will not deny Walsh's motion on account of his delay.

Accordingly, I will grant Walsh leave to amend his complaint only to add a money damages claim against the DOC under the Rehabilitation Act.

### CONCLUSION

In accordance with the foregoing analysis, the Court enters the following orders:

(1) Defendants' motion to dismiss (Doc. #20) is DENIED.

(2) Walsh's motion for leave to amend his complaint (Doc. #24) is GRANTED to the limited extent described in this order. Walsh's second amended complaint (Doc. #24-1) is now the operative complaint in this case, but only the claims identified in this Order can proceed. Specifically, Walsh's claims for injunctive relief brought under the Americans with Disabilities Act and under the Rehabilitation Act may proceed against defendants Rollin Cook and Kristine Barone in their official capacities, and Walsh's Rehabilitation Act claim for money damages may proceed against defendant DOC only. All Walsh's other claims are DISMISSED.

(3) The Clerk shall prepare a summons form and send an official capacity service packet, including the second amended complaint (Doc. #24-1) to the United States Marshal Service. The U.S. Marshal is directed to effect service of the complaint on the defendants in their official capacities at the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141 within **twenty-one (21) days of the date of this Order**, and to file a return of service within **thirty (30) days of the date of this Order**.

(4) The Clerk shall send a courtesy copy of the amended complaint and this Order to the DOC Office of Legal Affairs.

(5)  The defendants shall file their answer to claims that may proceed in the second amended complaint (Doc. #24-1) within **twenty-one (21) days after service**.

(6)  In accordance with the Court's prior order granting defendants' motion for extension of time (Doc. #30), all motions for summary judgment shall be filed within **fifty-six (56) days from the date of this Order**.

(7)  Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(8)  All other previously entered orders remain in effect except as modified by this order.

It is so ordered.

Dated at New Haven, Connecticut this 30th day of November 2020.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge