## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PATRICK WALSH,
    *Plaintiff*,

    v.                                          No. 3:19-cv-980 (JAM)

DR. JOSEPH COLEMAN, *et al.*,
    *Defendants*.

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

Plaintiff Patrick Walsh is a sentenced prisoner of the Connecticut Department of Corrections ("DOC") in the MacDougall-Walker Correctional Institution ("MWCI"). Walsh has filed this lawsuit *pro se* alleging a number of violations of his rights by the DOC and state prison officials arising from their alleged failure to accommodate his requests for single-cell status and for special transport arrangements which would allow Walsh to be transported by himself when it is necessary for him to leave his prison facility for medical or legal reasons. Walsh's remaining claims seek injunctive relief against DOC officials under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act, as well as damages against the DOC under the Rehabilitation Act.

Defendants now move for summary judgment. Because there remain genuine issues of material fact, I will deny the motion.

### BACKGROUND

The following facts are taken from parties' Local Rule 56(a) statements and supporting documents. The facts are presented in the light most favorable to Walsh as the non-moving party.

Prior to his incarceration, Walsh was diagnosed with Post-Traumatic Stress Disorder ("PTSD"), depression, anxiety, mixed personality disorder, episodic alcohol abuse, and

1

dysthymic disorder, and had been hospitalized and treated with various psychiatric medications.[1] Walsh was arrested and admitted into DOC custody in August 1995.[2] In June 1999, Walsh was found guilty of murder and was later sentenced to a 55-year term of imprisonment.[3] Although Walsh was regularly seen by DOC mental health staff and was prescribed numerous trials of psychiatric medications early in his incarceration, from 2003 to 2016 he did not receive any evaluation or treatment by mental health staff for his chronic conditions.[4]

Walsh details extensive outreach to DOC leaders and mental health staff, beginning in August 2016, seeking single-cell status to address his worsening mental health symptoms since he transferred to MWCI in 2013.[5] His initial outreach included letters to then-warden Carol Chapdelaine and then-Commissioner of Correction Scott Semple, and inmate requests to Dr. Joseph Coleman.[6] Walsh also submitted a Request for Reasonable Accommodations ("RRA") seeking single-cell status in August 2016, and an identical RRA in January 2017.[7]

In March 2017 Walsh was approved for "temporary single-cell status" for one to four months based on Dr. Coleman's recommendations, which also stated that in his view there were no clinical reasons for permanent single-cell status.[8] The next month, Walsh also filed his third RRA, requesting that he receive "[f]acility [i.e. solo] transport to and from [c]ourt and/or medical

---

[1] Doc. #54-3 at 11 (¶ 6) (Walsh's sworn declaration filed under seal). Many of the citations in this ruling are to documents that have been filed under seal; to the extent that this ruling describes selective portions of such sealed documents, the Court concludes that such portions as described do not warrant sealing or redaction in this ruling.

[2] *Id.* at 11 (¶ 3).

[3] *Id.* at 11 (¶ 4).

[4] *Id.* at 13 (¶ 14); *see also* Doc. # 54-2 at 2 (¶ 33) (indicating that as of October 2017, there was no treatment plan in place for Walsh's psychiatric conditions).

[5] Doc. #54 at 12-14.

[6] *Id*. at 13; Doc. #54-7 at 14-25; #54-8 at 1-6.

[7] Docs. #42-11 at 2; #54-7 at 3.

[8] Doc. #54-1 at 25-26 (¶¶ 16-17).

trips" because of his mental health conditions.[9] It was denied in May 2017, prompting Walsh to file a grievance.[10]

While temporarily in single-cell status, Walsh continued to advocate for extended or permanent single-cell status and solo transport, but these requests were denied, and Walsh's temporary single-cell status expired after three months in June 2017.[11] In July 2017, Walsh filed a grievance and an ADA appeal contesting the revocation of his single-cell status.[12]

As part of his ADA appeal, Walsh met with Colleen Gallagher, the DOC's Correctional Health Services Program Director and ADA Coordinator, and underwent a "Psychiatric Consultation" with Dr. Sohrab Zahedi.[13] Walsh expressed frustration with Dr. Zahedi's evaluation and recommendations, which focused on medication treatments that in his view have done little to improve his symptoms.[14] Dr. Zahedi agreed with Walsh that his risk of aggression would be improved through single-cell status, although he opined that it "would do little to improve symptoms associated with his psychiatric condition."[15]

In December 2017, Gallagher told Walsh that "[t]he psychiatrist agreed you would be better able to manage your symptoms with a single cell. He also stated that this environmental answer alone would not hold lasting effects and would be better to include medication in the plan to which you are currently unwilling to do."[16] Gallagher recommended that a treatment plan be

---

[9] Docs. #42-11 at 3; #54-2 at 11 (¶ 60).

[10] Doc. #54-7 at 7-8.

[11] Doc. #54-1 at 26 (¶ 17).

[12] *Id.* at 26 (¶ 18); Doc. #54-7 at 9-10.

[13] Doc. #54-1 at 27-28 (¶¶ 21-25).

[14] Doc. #54 at 15, 27.

[15] Doc. #54-1 at 30 (¶ 29).

[16] Doc. #42-10 at 4.

developed for Walsh "that addresses the need for alternative therapies" as well as the medication options suggested by Dr. Zahedi, and that Walsh be placed on single-cell status until his treatment plan was devised.[17] But Walsh was not placed on single-cell status.[18]

An initial "Mental Health Interdisciplinary Treatment Plan" was developed for Walsh later that month.[19] The plan articulated Walsh's diagnoses as severe anxiety disorder, PTSD, and Anti-Social Personality Disorder, and listed the lack of solitude and a single cell as "Obstacles to Treatment."[20] It recommended "a safe place where [Walsh] can work on reducing symptoms of anxiety and continue with somatic treatment."[21] The plan stated that Walsh was willing to take medication and would continue to use facility-provided programs.[22] Walsh agreed with the statements in the treatment plan and signed it.[23] However, on January 3, 2018, Dr. Coleman marked that plan a "draft."[24] On January 9, 2018, Dr. Coleman developed a treatment plan that did not list lack of solitude or a single cell as obstacles to treatment.[25] Walsh refused to sign this plan.[26]

In early 2018, Walsh retained Dr. Andrew Meisler, an expert in clinical and forensic psychology, to evaluate him.[27] Dr. Meisler diagnosed Walsh with chronic and severe PTSD, and

---

[17] Docs. #42-10 at 5; #54-2 at 1-2 (¶¶ 31-33).

[18] Doc. #54-1 at 4.

[19] Doc. #54-2 at 3 (¶ 36).

[20] Doc. #41 at 25 (medical record filed under seal).

[21] *Ibid*.

[22] *Ibid*.

[23] *Ibid*.; Doc. #54-2 at 3 (¶ 36).

[24] Doc. #41 at 25.

[25] *Id*. at 83.

[26] *Ibid*.; Doc. #54-2 at 3-4 (¶ 37).

[27] Doc. #54-4 at 1 (¶ 69) (Walsh's sworn declaration filed under seal).

recurrent major depressive disorder.[28] Dr. Meisler opined in October 2019, "with a reasonable

degree of psychological certainty, that single-cell status is a reasonable accommodation for

[Walsh's] condition."[29] Dr. Meisler explained that:

> First, his having had multiple cellmates placed with him over the past several years has aggravated his psychiatric condition, with a worsening of symptoms and increased risk for decompensation. Second, his cell status plays a critical role in whether or not treatment for his condition will be successful. Contrary to the opinion rendered by Dr. Zahedi, medication for symptom management alone is not likely to be an effective treatment for [Walsh's] condition, which is best described as Complex PTSD resulting from extended and severe childhood trauma. In contrast, evidence-based therapy using EMDR has a much greater likelihood of success. … Although evidence-based and effective, it is a difficult treatment to undergo and requires that the client be in a stable and safe environment. Indeed, the record reflects that the therapist providing the treatment has identified single cell status and a safe environment as required for successful treatment. …
>
> [A] permanent single cell status would provide the best chance for him to receive the evidence-based therapy that is most likely to be successful in treating his condition.[30]

Also in early 2018, Walsh began attending eye movement desensitization and

reprocessing ("EMDR") sessions, an alternative therapy that he had expressed interest in;

however, his provider—Licensed Clinical Social Worker Milna Rosario—has noted that Walsh

was "hesitant about continuing with EMDR due to emotions that are opened up."[31]

In June 2018, Walsh refused a cardiology appointment stating that he "can't take the

CTU ride due to mental health reasons" and that "the process of being detained within the 'bull-

pens' from 3 AM until 6 or 7 pm, with numerous other inmates … is too stressful and

traumatic… due to [his] psychological condition."[32]

---

[28] Doc. #54-6 at 4 (medical record filed under seal).

[29] *Ibid*.

[30] *Id*. at 4-5.

[31] Docs. #54-2 at 4 (¶ 38); #41 at 66.

[32] Doc. #41 at 41; Doc. #54-7 at 1 (medical record filed under seal). The Correctional Transportation Unit ("CTU")

As Walsh still did not have an active treatment plan as of September 2018, Rosario developed one at Gallagher's instruction that correctly listed Walsh's diagnoses, goals, and objectives, and stated, "Custody will provide [Walsh] with permanent single cell status."[33] Walsh agreed with this plan and signed off on it.[34] But then on October 6, 2018, Rosario amended the plan to state that Walsh "has not been promised, approved or authorized for permanent single cell status with the creation of this treatment plan."[35] In December 2018, Walsh refused another cardiology appointment because he "just couldn't take the trip."[36]

Due to worsening psychiatric symptoms, Walsh began another trial prescription of psychotropic medication in January 2019, which had little effect on his condition.[37] He also reached out to Warden Mulligan, verbally and through letters, about his unaddressed requests for single-cell status and solo transports.[38]

In February 2019, while awaiting a response from Mulligan, Walsh saw Dr. Syed Naqvi, who offered to have Walsh transported to see a doctor outside the prison.[39] Walsh refused CTU transport, citing his mental health disability, and saying that he "would not be able to tolerate the trip unless it was by way of Facility [i.e. solo] Transport."[40] Mulligan responded a week later that his single-cell status had been only temporary, "in order for [Walsh] to re-engage M[ental]

---

is responsible for transporting multiple inmates at a time. The "bull pens" are the holding areas for prisoners awaiting CTU. Doc. #42-1 at 13 n.6.

[33] Doc. #41 at 58; Doc. #54-2 at 5 (¶ 42).

[34] *Ibid*.

[35] Doc. #41 at 59.

[36] Doc. #41 at 82.

[37] Doc. #54-1 at 7.

[38] *Ibid*.; Doc. #54-9 at 5-6.

[39] Docs. #41 at 107.

[40] Doc. #54-4 at 16 (¶ 163).

H[ealth] services," and that an addendum to the treatment plan indicated he was not approved or authorized for permanent single-cell status.[41] Walsh states that he was unaware of the addendum to the treatment plan.[42] Walsh states that, when he verbally inquired about Mulligan's reply letter in March 2019, Mulligan told him that he has "never been a problem," and dismissed Walsh's concerns.[43]

Walsh continues to suffer due to his mental health disability, the environmental stress of being in a double cell, and the anxiety relating to anticipated CTU trips.[44] In May 2019, he refused an outside doctor's appointment "under duress" and outside radiological services because he could not "handle the stress of the bull pen."[45] The DOC has not granted Walsh permanent single-cell status or solo transport despite his repeated requests and ongoing psychiatric issues. However, after Walsh recently filed an RRA and ADA appeal seeking solo transport, the DOC stated that it would provide Walsh temporary solo transport or access to telemedicine if Walsh has appointments scheduled before a psychiatric evaluation for his request for solo transport can be conducted.[46] That evaluation had still not occurred as of June 23, 2021.

In June 2019, Walsh filed this lawsuit.[47] Following two initial review orders, the denial of a motion to dismiss, and multiple amended complaints, a limited set of Walsh's initial claims against three defendants remain.[48] Specifically, Walsh's remaining claims seek injunctive relief

---

[41]  Doc. #54-9 at 5.

[42] Doc. #54-1 at 7.

[43] Doc. #54-4 at 10 (¶ 126).

[44] Doc. #54-3 at 17 (¶ 44).

[45] Doc. #41 at 138, 141.

[46] Doc. #59-1 at 7, 9.

[47] Doc. #1.

[48] For prior rulings in this case, see *Walsh v. Coleman*, 2020 WL 7024927 (D. Conn. 2020); *Walsh v. Coleman*, 2019 WL 6529825 (D. Conn. 2019); *Walsh v. Coleman*, 2019 WL 3231194 (D. Conn. 2019).

under the ADA, 42 U.S.C. §§ 12131, *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*,

against DOC Commissioner Rollin Cook and MWCI Warden Kristine Barone, in their official

capacities. *See Walsh v. Coleman*, 2020 WL 7024927, at *12 (D. Conn. 2020). Walsh also seeks

money damages against the DOC under the Rehabilitation Act. *Ibid*. Walsh's claim for

injunctive relief against former Commissioner Cook is now against current DOC Commissioner

Angel Quiros by way of automatic substitution. *See* Fed. R. Civ. P. 25(d); *D'Alessandro v. City

of New York*, 713 F. App'x 1, 9 n.9 (2d Cir. 2017).

Defendants now move for summary judgment on Walsh's claims in their entirety.[49]

Walsh filed an opposition.[50] I heard oral argument on June 24, 2021, and this ruling now follows.

### DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well

established. Summary judgment may be granted only if "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the party

who opposes the motion for summary judgment and then decide if those facts would be

enough—if eventually proven at trial—to allow a reasonable factfinder to decide the case in

favor of the opposing party. The Court's role at summary judgment is not to judge the credibility

of witnesses or to resolve close and contested issues but solely to decide if there are enough facts

that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57

(2014) (per curiam); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir.

2019).[51]

---

[49] Doc. #42.

[50] Doc. #54.

[51] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text

Because Walsh is a *pro se* party, his submissions must be treated with special solicitude and afforded a liberal interpretation. *See Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). The Court's local rules ensure that a *pro se* party is thoroughly advised of the procedural requirements for opposing a summary judgment motion, *see* D. Conn. L. Civ. R. 56(b), and the defendants have complied with the rule's requirement to serve on Walsh a notice detailing the rules that govern a motion for summary judgment.[52]

The Second Circuit has explained that in order to establish a *prima facie* violation under the ADA and Rehabilitation Act, a plaintiff must show that (1) "he is a qualified individual with a disability"; (2) "[the defendant] is an entity subject to the acts"; and (3) "he was denied the opportunity to participate in or benefit from [the defendant's] services, programs, or activities or [the defendant] otherwise discriminated against him by reason of his disability." *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).[53]  Defendants do not contest either of the first two prongs.[54]

There are "three available theories" of discrimination that can be used to establish the third prong of an ADA and Rehabilitation Act claim: "(1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009).

---

quoted from court decisions.

[52] Doc. #42-3.

[53] As defendants recognize, Walsh's ADA and Rehabilitation Act claims are evaluated using the same analysis because they do not implicate the subtle distinctions between the statutes, although the availability of damages may vary between the statutes. *See Wright*, 831 F.3d at 72 ("Because the standards under both statutes are generally the same and the subtle distinctions between the statutes are not implicated in this case, we treat claims under the two statutes identically."); Doc. #42-1 at 9 n.2.

[54] Doc. #42-1 at 9 n.3.

9

Walsh brings his claims under a failure-to-accommodate theory of liability. Walsh claims that his disability (his numerous mental health conditions) prevents him from accessing medical, mental health, and other services without single-cell status and solo transport. As a result, under Walsh's theory, he was denied access to and excluded from receiving the benefits of those services when defendants declined to provide him with single-cell status and solo transport.

Defendants move for summary judgment as to their liability under the ADA and the Rehabilitation Act on three primary grounds, which I will address in turn.[55]

***Meaningful access***

Defendants argue that Walsh has not been denied meaningful access to prison services, programs, or activities, even without accommodation. "In examining [a failure to accommodate] claim, [the Court asks] whether a plaintiff with disabilities as a practical matter was denied meaningful access to services, programs, or activities to which he or she was legally entitled…In order to assure meaningful access, reasonable accommodations in the programs or benefits may have to be made." *Wright*, 831 F.3d at 72. Discouragement and deterrence from services has been found to be a barrier to meaningful access for purposes of the ADA and Rehabilitation Act. *See id.* at 72–73; *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 200 (2d Cir. 2014). "A plaintiff need not demonstrate that she is entirely precluded from accessing a benefit; rather, difficulty in accessing a benefit is sufficient to sustain a reasonable accommodation claim." *Scalercio-Isenberg v. Port Auth. of New York & New Jersey*, 487 F. Supp. 3d 190, 201 (S.D.N.Y. 2020).

---

[55] Defendants also move for summary judgment on Walsh's claim for money damages under the Rehabilitation Act solely on the ground that the DOC is not liable because there is no underlying violation of the Rehabilitation Act. Doc. #42-1 at 36. Because I conclude that there remain genuine issues of material fact regarding liability under the Rehabilitation Act, I will deny defendants' motion for summary judgment as to Walsh's claim for money damages under the Rehabilitation Act.

Defendants conceded at oral argument that lack of single-cell status could discourage an inmate with severe mental health issues from accessing the prison's mental health services, although they nonetheless maintain that Walsh has not been denied meaningful access to any prison services, programs, or activities. But viewing the evidence in the light most favorable to Walsh, a factfinder could reasonably conclude that, because of his serious mental health issues, the lack of single-cell status discouraged Walsh from accessing self-help groups like twelve-step programs, mental health treatments like EMDR, and other services like recreation, meals, or telephones. Walsh submitted substantial evidence that he takes every opportunity possible to be alone, skipping self-help programs, recreation, and meals when his cellmates are not in the cell.[56] He also states that he is unable to use the prison's phones because he cannot handle sitting with numerous other inmates after the stress of being in his cell with a cellmate.[57]

Walsh submits evidence suggesting that he has been discouraged from accessing self-help groups like twelve-step and meditation meetings because he "could not handle the stress in the cell with a cellmate, after [he] had opened [his] emotions in those groups."[58] His cellmates have noticed that "his issues were more prevalent after attending those groups."[59] Walsh's medical records reveal that he was "pulling back from group participation."[60]

Moreover, DOC personnel have repeatedly recognized that at least temporary single-cell status could allow Walsh better access to these services and programs. In January 2017, Dr. Coleman indicated that temporary single-cell status would allow Walsh to "reengage" with

---

[56] Doc. #54-4 at 26-27 (¶¶ 27–30); #54-5 at 3 (¶¶ 9–10, 15–16); 10–11 (¶¶ 18–25) (Walsh's cellmates' sworn declarations filed under seal).

[57] Doc. #54-4 at 9 (¶ 121).

[58] Doc. #54-4 at 9 (¶ 125); *see also* Doc. #54 at 14.

[59] Doc. #54-5 at 10 (¶ 17)*; see also id.* at 3-4 (¶ 17).

[60] Doc. #41 at 150.

mental health services.[61] In December 2017, a "Mental Health Interdisciplinary Treatment Plan," signed by Walsh, cites lack of solitude and a single cell as "Obstacles to Treatment," though Dr. Coleman later marked that plan a draft.[62]

Walsh also submits evidence that he was discouraged from EMDR by the lack of single-cell status. Walsh has refused a significant proportion of EMDR sessions.[63] Dr. Meisler attributes Walsh's discouragement to the lack of single-cell status, saying that EMDR "is a difficult treatment to undergo and requires that the client be in a stable and safe environment," and that Walsh "has curtailed the use of EMDR until he is in a more conducive and stable environment."[64] According to Dr. Meisler, "a permanent single cell status would provide the best chance for [Walsh] to receive the evidence-based therapy that is most likely to be successful in treating his condition."[65] In light of this evidence, there remains a genuine fact issue as to whether the lack of single-cell status discouraged Walsh from accessing prison services, programs, and activities.

Turning to the issue of Walsh's access to medical services outside of the prison, the parties agree that "any alleged deprivation of access to outside medical services," which would require transport to and from the prison, "does not stem from not having [single-cell status], but rather, stems from alleged transportation issues."[66]

---

[61] *Id*. at 5–6; Doc. #42-8 at 4 (¶ 9); Doc. # 42-1 at 18 n.11.

[62] Doc. #41 at 25.

[63] Docs. #54-1 at 6-7; # 54-2 at17 (¶ 26).

[64] Doc. #54-6 at 4.

[65] *Id*. at 5.

[66] Doc. #42-1 at 12; Doc. #54 at 23.

The record shows that Walsh refused at least five trips to outside medical services, which prison staff often recorded as stemming from his disability.[67] Walsh also states that he verbally refused several other trips after informally requesting but not receiving solo transport, which were not recorded in his medical records.[68] A reasonable factfinder could conclude that the lack of solo transport deterred or discouraged Walsh from accessing outside medical services, and therefore that Walsh did not have meaningful access to those services.

Additionally, defendants argue that they did not have notice of or an opportunity to review Walsh's requested accommodation between May 2017 and April 2021 because Walsh did not file any ADA requests for solo transport during that time.[69] But even though Walsh did not file any additional ADA requests for solo transport between May 2017 and April 2021, he filed a grievance concerning the denial of his request for solo transport in May 2017.[70] And as noted, Walsh also frequently cited his disability as a reason for refusing CTU transport to outside medical services during that period and claims that he verbally refused several other trips after requesting but not receiving solo transport.[71]

Given this evidence, a reasonable factfinder could conclude that defendants had notice of and an opportunity to review Walsh's request after May 2017. *See Tsombanidis v. West Haven Fire Department*, 352 F.3d 565, 579 (2d Cir. 2003) ("[a] governmental entity must know what a plaintiff seeks prior to incurring liability for failing to affirmatively grant a reasonable accommodation. It may be that once the governmental entity denies such an accommodation,

---

[67] Doc. #41 at 41, 82, 107, 138, 141.

[68] Doc. #54-4 at 15–16 (¶¶ 158–166).

[69] Doc. #42-1 at 16-17; Doc. #54-2 at 11-12 (¶ 63); Doc. #59 at 2.

[70] Doc. #54-7 at 7–8.

[71] Doc. #41 at 41, 82, 107, 138, 141; Doc. #54-4 at 15–16 (¶¶ 158–166).

[Title II of] the ADA [does not] require a plaintiff to exhaust the state or local administrative procedures."); *Costabile v. New York City Health & Hospital Corp.*, 951 F.3d 77, 82 (2d Cir. 2020) (holding that plaintiff failed to plausibly allege that defendants had notice because he never requested an accommodation, either formally or informally).

Accordingly, I conclude that there remain material facts in dispute as to whether Walsh had meaningful access to services inside or outside of MWCI, and I will deny defendants' motion for summary judgment on this ground.

### *Plainly reasonable accommodations*

Defendants argue that they have provided Walsh with plainly reasonable accommodations for his disability, including through the development of accommodation plans, EMDR treatment, and medication.

"Determining the reasonableness of an accommodation is a fact-specific question that often must be resolved by a factfinder. A defendant is entitled to summary judgment only if the undisputed record reveals that the plaintiff was accorded a plainly reasonable accommodation." *Wright*, 831 F.3d at 72-73. "The hallmark of a reasonable accommodation is effectiveness…An accommodation is not plainly reasonable if it is so inadequate that it deters the plaintiff from attempting to access the services otherwise available to him." *Ibid.*

Here, for reasons already discussed, defendants have not shown on an undisputed record that their various attempted accommodations are plainly reasonable as a matter of law. In particular, there remains a genuine dispute as to whether Walsh was discouraged or deterred from accessing services after December 2017, including EMDR itself.[72]

---

[72] Defendants also argue that they accommodated Walsh by allowing him to cell alone while an accommodation plan was developed and by affording him the opportunity to select a new cellmate when one would move out. Doc. #42-1 at 23–24. However, whether an accommodation is plainly reasonable depends on the undisputed record. *Wright*, 831 F.3d at 72-73. Walsh provides evidence that he was not able to cell alone or choose a cellmate during

Defendants have not cited caselaw or a regulation suggesting that their offered accommodations are *per se* reasonable, and Walsh does not concede that the accommodations are effective. *See, e.g.*, *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 96–97 (2d Cir. 2015) (finding the provision of ASL interpreters to a deaf employee was plainly reasonable because a regulation defined reasonable accommodation to include the provision of interpreters and the plaintiff conceded that interpreters were an effective accommodation in some contexts). To the contrary, Walsh has consistently maintained that defendants' accommodations have not been effective.[73]

Defendants rely on *Fowler v. Dep't of Correction*, 2019 WL 1025243 (D. Conn. 2019), in support of their claim that the accommodation they provided is plainly reasonable. In that case, I granted defendants' motion for summary judgment, finding that they had provided a reasonable accommodation even though they denied plaintiff's request for a specialized cell that would allow him to live alone. There, a doctor who treated the plaintiff testified that a single cell would be unnecessary, and that living with another person would even be beneficial to him. In contrast, Walsh's medical records and correspondence with prison staff have—at times—directly acknowledged that single-cell status would allow Walsh to engage with mental health services and would benefit him.[74] For example, in December 2017, Walsh and LCSW Rosario both signed a Mental Health Disciplinary Treatment Plan that listed "lack of a single cell" and "lack

---

those times. Doc. #54-1 at 4.

[73] To the extent that Walsh could be said to have agreed to defendants' accommodation, the record reflects that he has done so only when defendants offered his requested accommodation of single-cell status. Doc. #41 at 25, 58. When proposals did not include single-cell status, Walsh refused to sign them. Doc. #54-2 at 3–4 (¶¶ 37–38). Walsh agreed to the September 2018 treatment plan, though he maintains that the October 2018 addendum stating "Mr. Walsh has not been promised… permanent single cell status with the creation of this treatment plan" was added without his knowledge. Docs. #41 at 59; #54-1 at 7.

[74] Docs. #41 at 5–6, 25, 58; #42-8 at 4 (¶ 9); #54-9 at 5.

of solitude" as obstacles to his treatment.[75] In September 2018, LCSW Rosario presented Walsh

with a treatment plan that he agreed with, which stated "Custody will provide Mr. Walsh with

permanent single cell status."[76] Dr. Meisler, who does not work for the prison, also recommends

single-cell status as beneficial for Walsh's ability to access mental health treatment.[77]

These facts make this case the unusual case where a genuine fact issue remains to support

a prisoner's insistence that he be placed on single cell status.  The evidence here is sufficient for

a reasonable factfinder to conclude that defendants' accommodations have not been effective or

plainly reasonable. Accordingly, I will deny defendants' motion for summary judgment on this

ground.[78]

### Facially reasonable accommodations

Finally, defendants argue that Walsh's requested accommodations are not facially

reasonable and that they would create an undue hardship for defendants. This argument is

evaluated under the Second Circuit's burden-shifting framework for ADA and Rehabilitation Act

claims. In that framework, "the plaintiff bears the initial burdens of both production and

persuasion as to the existence of an accommodation that is facially reasonable. The burden of

persuasion then shifts to the defendant to rebut the reasonableness of the proposed

accommodation. This burden of non-persuasion is in essence equivalent to the burden of

---

[75] Doc. #54-2 at 3 (¶ 36).

[76] *Id.* at 5 (¶ 42); Doc. #41 at 58.

[77] Doc. #54-6 at 5.

[78] Defendants mainly argue that their accommodations were plainly reasonable, even without single-cell status, rather than that their accommodations were plainly reasonable, even without solo transport. With respect to solo transport, they rely on their arguments that solo transport was not necessary for Walsh to have meaningful access to outside medical services and that they did not have notice of Walsh's request. Doc. #42-1 at 22. But as discussed above, Walsh has raised genuine disputes over whether he requires solo transport to access outside medical services, and that defendants were on notice of his request. Therefore, they have not established that an accommodation without solo transport is plainly reasonable.

showing, as an affirmative defense, that the proposed accommodation would cause the defendant to suffer an undue hardship." *Wright*, 831 F.3d at 76.

Walsh has met his "light burden of production as to the facial reasonableness of his proposed accommodation." *Ibid.* Viewing the evidence in a light favorable to him, Walsh has raised a genuine dispute as to whether lack of single-cell status and solo transport were barriers to his meaningful access of services. By the same token, Walsh's evidence supports the finding that single-cell status and solo transport would remove those barriers and thus serve as effective accommodations. Moreover, in addition to Dr. Meisler's opinion that single-cell status would be an effective accommodation for his disability, various DOC employees over time have recognized that single-cell status would be helpful for Walsh's access to mental health treatments.[79] And as of June 23, 2021, defendants are offering Walsh solo transport as an accommodation on a temporary basis, which may become permanent depending on a psychiatric evaluation.[80] This evidence is sufficient to meet Walsh's "light burden" to show that his requested accommodations are facially reasonable at this stage.

Moving to the second stage of the framework, defendants argue that Walsh's proposed accommodations would create undue financial, administrative, and operational hardships.[81] With respect to single-cell status, defendants argue that there are only five cells designed for a single occupant and five handicapped cells designated for single occupants in the MacDougall building of MWCI, where Walsh is currently housed.[82] Because providing an inmate with single-cell status requires the use of more cell space, moving Walsh's cellmate to a new cell could create

---

[79] Doc. #41 at 5–6, 25, 58; Doc. #42-8 at 4 (¶ 9); Doc. #54-9 at 5.

[80] Doc. #59 at 2.

[81] Doc. #42-1 at 31, 35.

[82] Doc. #54-2 at 8–9 (¶¶ 54–55); Doc. #42-4 at 3 (¶ 9).

some amount of an administrative and operational burden: If there is no room in that housing unit, there would be a burden associated with transferring the inmate to a different unit.[83]

But Walsh provides evidence showing that Connecticut's inmate population has been decreasing generally and at MacDougall specifically since 2016.[84] Walsh also presents evidence that, at times, bunks remain empty for weeks or months, allowing some inmates to cell alone for extended periods in cells that would otherwise house two people.[85] On the record in this case, a factfinder could reasonably conclude that providing Walsh with single-cell status would not be an undue burden on defendants.[86]

As for solo transport, defendants argue that it would be an undue burden to provide solo transport to Walsh because it requires the use of an MWCI-specific vehicle, in addition to the CTU vehicles provided by the DOC, and also generally requires additional MWCI staff members who would be paid overtime.[87] But defendants do not point to any caselaw that suggests the particular financial, administrative, and operational burdens they cite would pose an undue hardship. A reasonable factfinder could agree with Walsh that the extra costs associated with providing him solo transport is minimal and not an undue hardship because providing solo transport to inmates is in the DOC's ordinary course of business.[88]

---

[83] Doc. #54-2 at 10 (¶ 58); Doc. #42-4 at 4 (¶ 10).

[84] Doc. #54-9 at 20; Doc. #54-10 at 1.

[85] Doc. #54-1 at 10; #54-5 at 5 (¶¶ 33–34), 13 (¶¶ 43–44), 15 (¶ 52).

[86] Defendants also claim that the housing-related burdens are amplified by the COVID-19 pandemic because the use of some housing units for medical isolation has limited available housing space. Doc. #42-2 at 4 (¶ 13); Doc. #54-2 at 10 (¶ 59). But Walsh was initially denied single-cell status long before the pandemic, and any pandemic-related hardships can be expected to ease as the incidence of COVID-19 in Connecticut has sharply declined. Doc. #54-1 at 26 (¶ 18).

[87] Doc. #54-2 at 12 (¶ 64–65), (¶¶ 68-69).

[88] Doc. #54-1 at 15. Defendants also argue that if a solo transport were unplanned, two staff members would have to be pulled from their normal posts, which could disrupt MWCI's normal operations. Doc. #54-2 at 13-14 (¶ 69). But as Walsh argues, this burden is not relevant to the reasonableness of his requested accommodation because an unplanned trip would happen only in an emergency, in which case any inmate would receive solo transport

18

I am mindful that "prisons are unique environments where deference to the expert views of prison administrators is the norm," but that deference applies most strongly "in particular" to "whether an accommodation would undermine prison security and order or hinder facilities from operating in a manageable fashion." *Wright*, 831 F.3d at 78. Here, defendants do not claim that Walsh's requested accommodations would undermine security and order. All in all, I conclude that there remain genuine disputes of material fact as to whether Walsh's proposed accommodations are reasonable or would pose an undue burden, and accordingly I will deny the defendants' motion for summary judgment on this ground.

CONCLUSION

For the reasons set forth above, the defendants' motion for summary judgment (Doc. #42) is DENIED. I have considered all other arguments raised by the defendants even if these arguments have not been expressly addressed in this ruling.

It is so ordered.

Dated at New Haven this 19th day of July 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

regardless of disability. *Ibid*.